**Eerik HEINE, Appellant,**

v.

**Juri RAUS, Appellee.**

**No. 11195.**

United States Court of Appeals
Fourth Circuit.

July 22, 1968.

Robert J. Stanford, and Ernest C. Raskauskas, Washington, D. C., for appellant.

Paul R. Connolly, Washington, D. C. (Williams & Connolly, E. Barrett Prettyman, Jr., and Hogan & Hartson, Washington, D. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and CRAVEN, Circuit Judges.

## HAYNSWORTH, Chief Judge:

In this slander action, the plaintiff appeals from an order of summary judgment entered against him, on the ground of governmental privilege, after a partial disclosure limited by invocation by the Central Intelligence Agency of the governmental privilege against disclosure of state secrets. The controversy, thus partially surfaced, arose out of the Central Intelligence Agency's intelligence and counterintelligence activities and its attempt to expose the plaintiff as a Soviet KGB agent, a defamation which the plaintiff alleges to be false.

The plaintiff, Eerik Heine, is an Estonian emigré residing in Canada. With an apparent history as a "freedom fighter" in Estonia, he was an occasional lecturer in the United States and an exhibitor of an anti-communist film. As such, he was known to the leaders of Estonian emigrés in the United States and apparently entitled to their confidence.

The defendant, Juri Raus, is also an Estonian emigré. He resides in the United States and is the National Commander of the Legion of Estonian Liberation. He readily admits that he told the Board of Directors of the Legion that he was reliably informed by an official agency of the United States that Heine was a Soviet agent or collaborator and that the Legion should not cooperate with him. This, the plaintiff charges, made his film and his lecture no longer salable and brought him into disgrace in the Estonian communities in the United States and Canada.

In his initial answer, Raus claimed only a qualified privilege. He claimed that he had spoken, without malice, only as an officer of the Legion and only on privileged occasions to privileged persons. There was no indication of any involvement of the CIA. Later, however, an amended answer was tendered, supported by a series of affidavits executed by the Director or Deputy Director of the CIA, in which the absolute executive privilege was claimed. In those documents it was alleged that Raus was an undercover or secret agent of the CIA,[1] had executed special assignments for it in the past and acted under the instructions of the CIA when he "warned" his fellow Legionnaires that Heine was a Soviet agent. Earlier disclosure of these circumstances was said to have been prevented by a CIA secrecy agreement, to which Raus had subscribed and which purported to carry with it punishment for violations under 18 U.S.C.A. §§ 793 and 794, including life imprisonment or death. When the first answer was filed, counsel for the CIA had refused permission to Raus to disclose his CIA connection.

Thereafter, the plaintiff sought to take Raus' deposition in order to obtain additional information about his employment by the CIA. The Director of the CIA, through his General Counsel, appeared for the taking of the deposition,[2] and, on a question by question basis, in the presence of the Judge, invoked the government's privilege against disclosure of state secrets. Raus was allowed to state that he had been paid, directly or indirectly, for services he had rendered the CIA, but the privilege was sustained to prevent probing of the details of his employment.

Otherwise, it appears from affidavits of the Director of the CIA that Raus and other Estonian emigrés in the United States had been sources of foreign intelligence and that the purpose of the instruction to Raus to discredit Heine was to protect the integrity of the CIA's sources of foreign intelligence within Estonian

---

1. His overt employment was in the Bureau of Public Roads in Washington.

2. Earlier, in an affidavit, the Director, himself, had sought to invoke the secrecy privilege generally as to any information in addition to that disclosed in the affidavits.

emigré groups or developed through them.

In that state of the litigation, the District Court granted a motion for summary judgment.[3] It was of the opinion that the absolute governmental privilege was available to a government employee such as Raus, who faithfully executed his instructions, as to one of higher authority exercising discretionary functions within the outer perimeter of his authority.[4] We agree, provided the instructions were issued by one having authority to issue them.

## I

█ At the outset it is well to put to one side the question of the CIA's right to invoke the government's privilege of silence with respect to "state secrets."

"The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect. The latter requirement is the only one which presents real difficulty." United States v. *Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953).

The District Court was quite correct in its allowance of the governmental claim of the privilege of secrecy. It was properly invoked generally by the Director of the CIA. The Court made sufficient inquiry—some of it *in camera*—to assure that it had not been done lightly, without pressing so far as to reveal the very state secrets the privilege is intended to protect. When the deposition of Raus was taken, he ruled upon each question calling for information arguably within the privilege, requiring Raus to answer those which the Court thought would not impair the privilege while foreclosing answers to those questions which apparently would. In his conduct of the proceedings, we think he balanced, as fairly as possible, the conflicting interests and was faithful to the "formula of compromise" taught by *Reynolds*.

We affirm the right of the CIA in this case to invoke the governmental privilege against disclosure of state secrets and its allowance, to the extent it was allowed, by the District Court.[5]

## II

On the question of executive privilege in defamation suits, we also agree generally with the District Court, its analysis of *Barr v. Matteo* and its reasoning, though we come to the conclusion that one more detail should have been supplied before entry of summary judgment.

In *Barr v. Matteo*, it was held that the Acting Director of the Office of Rent Stabilization was entitled to the protection of the absolute executive privilege. Responding to congressional criticism of the agency, Barr issued a press release announcing his intention to suspend two subordinate officials and placing upon their shoulders responsibility for the payouts under criticism. Three justices joined Mr. Justice Harlan in the leading opinion in which the governmental interest in having officials, exercising discretionary authority, assured freedom to act in the interest of the agency without fear of having to defend actions for defamation was balanced against the interest of the individual plaintiffs in seeking judicial rehabilitation of their reputations. With reliance upon the analysis and justification of Judge Learned Hand

3. Heine v. Raus, D.C.Md., 261 F.Supp. 570.

4. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454.

5. In addition to requiring Raus to answer some questions, the District Court rejected the first affidavits of the Director of the CIA as insufficient to support the claim of absolute governmental privilege. As a result, additional affidavits containing additional information were filed.

in *Gregorie v. Biddle*, 2 Cir., 177 F.2d 579, 581, quoted also by the District Court in its opinion in this case, preference was given to the governmental interest. Mr. Justice Black, emphasizing the interest of the public in being informed of such matters, concurred. Mr. Justice Stewart agreed with the analysis of the leading opinion, but dissented because he thought Barr had acted to save his own hide by diverting criticism from himself to the plaintiffs, and not in the interest of the agency. The Chief Justice and Justices Douglas and Brennan dissented generally on the ground that the absolute executive privilege should be limited to the President and cabinet officers [6] and, possibly, other appointed officials directly responsible to the President.

If *"Barr v. Matteo* extended the earlier decisions of this Court to what I and others considered to be the breaking point," as Mr. Chief Justice Warren observed when dissenting from the denial of a writ of certiorari in *Becker v. Philco Corp.*, 389 U.S. 979, 980, 88 S.Ct. 408, 409, 19 L.Ed.2d 473, this case is much closer to the earlier precedents if we assume that the actor was the Director, himself.

Unlike Mr. Barr, the Director of the CIA is appointed by the President of the United States with the advice and consent of the Senate. He is responsible to the President through the National Security Council. His office is not of cabinet rank, but it is a highly sensitive position. Necessarily, the Director must work in close collaboration with the President, himself, and with such cabinet officers as the Secretary of State and the Secretary of Defense. He is closer by far to the White House than an acting Director of Rent Stabilization, a subordinate official under the Director of Economic Stabilization.

In *Barr v. Matteo*, too, there was room for Mr. Justice Stewart's view that Barr

acted not so much to protect the agency from criticism as to divert the criticism from his shoulders to those of his two subordinates. Here, in contrast, we have no such possibility. While we cannot penetrate the cloak of secrecy which surrounds the CIA, there is no reason to suppose the defamation had any relation to the Director's personal career or his reputation or to those of his subordinates. For all that appears, it was done entirely out of consideration of the national interest.

The CIA and its Director are specifically charged with the duty and responsibility of protecting sources of foreign intelligence and methods of collecting such intelligence from unauthorized disclosure.[7] That aliens within this country are sources of foreign intelligence, as claimed by the Director, has been recognized by the Congress. If the Director determines that an alien's entry for permanent residence in the United States is in the interest of national security or essential to the Agency's intelligence mission, the entry of the alien and his family is allowed though they would be otherwise inadmissible.[8] Unlike Barr, who acted under no direction or specific authorization to issue press releases, action here to protect the integrity of sources of foreign intelligence was explicitly directed by Congress.

If it be said that the defamation here was deliberate, and it was, it was no more deliberate than the defamation in *Barr v. Matteo*, and its purpose was loftier. While the veil of secrecy hampers our appraisal of the situation confronting the CIA, enough appears to relate the defamation to governmental interests.

The Director has sworn in his affidavits that Raus and other Estonian emigrés in this country had been sources of foreign intelligence and that other sources of such intelligence had been developed through them. Plainly implicit in the Director's affidavits and the testi-

---

**6.** See Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780.

**7.** 50 U.S.C.A. §§ 403(d) (3), 403g.

**8.** 50 U.S.C.A. § 403h.

mony is the receipt by the CIA of information, believed reliable, that Heine was a secret Soviet agent. Such agents do not wear the guise of their masters and if one could successfully infiltrate the Estonian emigré sources in this country he could expect to discover the foreign sources of intelligence developed through them. In such circumstances, is the CIA to seek an indictment on charges it cannot prove if the sources of its information are its own secret agents in the Soviet Republic? Is it to sit idly by, suffering a pollution of its sources of foreign intelligence and the intimidation, arrest and persecution of its foreign agents? Or can it protect its sources of information, as required by the statute, by "warning" its own sources that the infiltrator is, or may be, a Soviet agent? In a sensitive area, closely touching national defense, the latter choice seems the one demanded by the national interest, notwithstanding the devastating impact of the warning upon the one thus accused of espionage. While the effect of the defamation upon the plaintiff here may have been greater than the harm suffered by the plaintiffs in *Barr v. Matteo*, the relation of the defamation to the national interest is much closer.

While the claim of secrecy prevents our obtaining a clear view of the entire scene, the Director's sworn, but undocumented, claims are enough to support the claim of governmental privilege. That ought to be enough when the statements are those of an official in so responsible an office and a requirement of further documentation and elaboration would violate the privilege of state secrets or greatly burden its exercise.

Thus far, our analysis of the problem is deficient, for we have assumed that the Director, himself, was the author of the defamation. The present record does not show that he was, though it is certainly inferable that the instructions to Raus were given by one having authority from the Director to issue them. In

appraising this case in comparison with *Barr v. Matteo*, however, it has been useful to start with the assumption that the Director, himself, uttered the defamation, for it should follow, as of course, that the subordinate who acts with the authorization of the superior is entitled to claim the same privilege as the superior.

■ If, in defamation cases, recognition of an absolute privilege for judges, legislators and highly placed executive officers of the government, when acting in line of duty, is to serve its intended purpose, it must extend to subordinate officials and employees who execute the official's orders. There would be little purpose to a cloak of immunity for Mr. Barr if Mr. Matteo were allowed to maintain an action for defamation against all of those subordinates in his office who "published" the defamation in the course of handling and distributing the press release. There would be no advantage in protection to a judge against actions for defamation founded upon statements made by him in an official opinion written for his court, if such actions could readily be maintained against his secretary who, at his direction, typed and transmitted the opinion, or against the clerk of the court who published it. If the circumstances impose a compelling moral obligation upon the superior to defend and indemnify the subordinates, immunization of the superior alone from direct defamation actions would be a useless formalism.

■ Recognition of an absolute privilege of the subordinate by attribution of the superior thus appears to be a necessary corollary of the superior's privilege. It is generally recognized that an agent, acting within the scope of his authority, does have whatever privilege the principal would have enjoyed if he had acted for himself.[9] The principle is applicable in defamation actions [10] and, if an authorized agent would have been privi-

---

9. Restatement (Second), Agency § 345 (1958).

10. Ibid. Illustration 2.

leged, subsequent ratification confers the privilege upon an unauthorized agent.[11] Applicability of the principle to this case has been suggested in an article generally critical of the District Court's decision.[12]

■ We conclude that the absolute privilege is available to Raus if his instructions were issued with the approval of the Director or of a subordinate authorized by the Director, in the subordinate's discretion, to issue such instructions, or if the giving of the instructions was subsequently ratified and approved by such an official.

■ Though the Director's affidavits state that Raus acted under instructions of the CIA, which certainly strongly implies that the instructions were given by, or with the approval of, a responsible, authorized official of the Agency and though the Director's appearance in the case carries with it a strong implication of his personal ratification and approval, it is said that on the present record there is still a permissible inference that the instructions were given by an unauthorized underling and that his action has never had the approval of a responsible official of the Agency having authority to issue or approve such instructions. The inference seems unlikely, but we cannot say it is foreclosed by the present record.

■ Since summary judgment was issued, we will vacate the judgment so that, if the plaintiff represents to the District Court serious reliance upon the inference, further inquiry may be had and additional findings made. The inquiry should be directed to the identity of the official within the Agency who authorized or approved the instructions to Raus. Disclosure of the identity of the individual who dealt with Raus is not required; the answer to be sought is whether or not the Director or a Deputy Director or a subordinate official, having authority to do so, authorized, approved or ratified the instructions. If such disclosures are reasonably thought by the District Judge to violate the claimed privilege for state secrets, they may be made *in camera,* to that extent. Disclosures *in camera* are inconsistent with the normal rights of a plaintiff of inquiry and cross-examination, of course, but if the two interests cannot be reconciled, the interest of the individual litigant must give way to the government's privilege against disclosure of its secrets of state.

Finally, we may observe that while we generally approve entry of summary judgment for the defendant, subject only to the limited additional inquiry we direct, the plaintiff would fare no better if the defendant's privilege were held to be not absolute, but only qualified. Heine cannot controvert the claim of Raus, supported by the CIA, that he acted under instructions of that Agency.[13] Heine claims no publication exceeding the instructions. He has no basis for a showing of malice. If summary judgment is appropriate after the additional, limited inquiry we direct, it will avoid the necessity of a trial and possible compromise of state secrets which the government is entitled to preserve.

Vacated and remanded.

CRAVEN, Circuit Judge (concurring and dissenting):

I agree with the court that summary judgment was improvidently entered. In addition to the deficiency pointed out by Chief Judge Haynsworth in the majority opinion, I suggest there are others, especially the failure to develop the scope of Raus' duty. Indeed, it seems to me the affidavits and meager information elicited from Raus by deposition are merely conclusory and not at all sufficient to support summary judgment. I believe it error to accept general asser-

---

11. Ibid. Comment (e).

12. Spying and Slandering: An Absolute Privilege for the CIA Agent? 67 Col.L. Rev. 752.

13. Here, it would matter not if the instructions were unauthorized within the Agency as long as Raus believed them to be.

tions [1] as a basis for summary judgment where the opposing party is without access to information normally available to test the affidavits because of the invocation of the state secrets privilege. Cf. Fed.R.Civ.P. 56(f).

The court says that if executive immunity "is to serve its intended purpose, it must extend to subordinate officials and employees who execute the officials' orders." This means that millions of federal employees are accorded absolute immunity from any liability whatsoever for *intentional* defamation either because such employees fall within the definition of "official" or "officer" as defined in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed. 1434 (1959), or, like Raus, take orders from those who do. On remand, there is to be no further inquiry as to Raus' "scope of duty." It seems to me the court is assuming [2] that the publication of defamation is within his official duties, or it is holding that so long as he did what he was told to do the privilege extends even to conduct outside the scope of employment. I cannot believe that the latter is intended [3] and, therefore, conclude the court must be making the assumption. But the burden of proof is upon Raus to show that he is entitled to executive immunity, and there is no presumption to aid him. Prosser, Torts

§ 111 at 823 (3rd ed. 1964). Clearly, it seems to me, he has failed to sustain his burden. That he may have failed to do so because of (a) his secrecy agreement with CIA or (b) CIA's invocation of the executive privilege to protect state secrets are appealing factors that furnish no leverage for decision. Raus does not attack the secrecy agreement if, indeed, he could do so. We are agreed that we may not invalidate the state secrecy privilege. If the result be that Raus cannot show that he acted within the scope of his employment and is thus entitled to a derivative privilege, it does not seem to me that the court ought to assume what he cannot establish. To do so is to put upon Heine a burden of proof that is not his and which he cannot possibly sustain: to show that Raus is *not* entitled to executive immunity.

The National Security Act specifically delegates to the *Director,* and not to the Agency, the statutory power relied on by the CIA and the district judge to justify the defamatory statements, and the affidavits do not suggest that the Director personally instructed Raus to defame Heine, nor is there any showing that the Director approved the defamation of Heine or properly delegated his responsibility to protect intelligence sources. [4] On

1. Rule 56(e) contemplates that a sufficient affidavit shall "set forth such facts as would be admissible in evidence."

2. It is true that Helms' affidavit contains the assertion that Raus was "acting within the scope and course of his employment" and was instructed to publish the defamatory words. Without factual averments, i. e., job description, the statement is simply a legal conclusion, unless one is willing to say employment is always co-extensive with instructions of the employer.

3. If Raus had shot Heine, presumably no court would exonerate him of tort liability on the ground he was told to do it —not even for the purpose of shielding the government official who told him. "When 007 plinks an enemy with a well directed projectile from his trusty Wal-

ther PPK .32, aficionados give no thought to his possible legal liability; we are all aware that Bond is licensed to kill. In the real world, however, intelligence agents often strike not with guns but with words—allegations that destroy reputations, families, careers. And the question of their responsibility before the law is not nearly so settled as it is in the Fleming phantasmagoria." Comment, Spying and Slandering: An Absolute Privilege for the CIA Agent? 67 Colum.L.Rev. 752 (1967), citing I. Fleming, Goldfinger 29 (1959).

4. Helms' affidavit of April 1, 1966, shows a broad delegation of powers to the Deputy Director effective April 28, 1965— long after the defamation of Heine occurred in 1963 and 1964.

remand, surely a probing inquiry into this matter can be accomplished without compelling disclosure of "state secrets." I do not view the omission as one sure to be remedied by the filing of another conclusory affidavit.

The court today, it seems to me, extends *Barr* beyond its breaking point. I would not go so far for several reasons, one of which is the court's concession that it is not necessary to do so, and that a qualified privilege would adequately protect the government employee in this case. I agree that such a result seems likely, and I would be content if Raus were accorded only that privilege and Heine given the opportunity to prove, if he can, actual malice.

What distinguishes this case for me from *Barr* and its progeny is the deliberate choice by the Central Intelligence Agency of defamation of character as an instrument of national policy. Such a factor alone seems to me to adequately distinguish *Barr* and all other cases with which I am familiar. I do not believe the Supreme Court in *Barr* intended that the immunity there recognized should extend to intentional defamation as an instrument of governmental policy. But if I am wrong about that, I suggest that a rule must be fashioned to limit the exercise of intentional defamation to responsible officers and officials. To immunize millions of government subordinate employees from liability for intentionally slandering private persons upon their mere explanation that they were told to do it, and the assertion that it was within the scope of employment, destroys, in my opinion, the balance that was struck in *Barr*. If the CIA must defame someone in order to protect national security, it seems to me it could be done more effec-

tively by the Director himself rather than a secret underling—and with far less danger to a free society.

Justifying factors found in recent cases where absolute executive immunity has been sustained are not present in this case. See Spying and Slandering: An Absolute Privilege for the CIA Agent? 67 Colum.L.Rev. 752, 766–768 (1967). There is here no comment which served the interest of discussion and criticism of government activity or foreign relations. Not involved here are intra-departmental confidential communications necessary to the intelligent functioning of government. Nor is there any possibility here of scrutiny by an alternative remedial procedure in which Heine might vindicate himself or rehabilitate his reputation.[5] The privilege is sought by one who is not subject—as are most federal employees—to normal public scrutiny and sanctions for improper conduct. Since Raus was instructed to defame Heine, it is scarcely to be supposed he will be reprimanded by CIA for doing so.

Unlike Barr v. Matteo and other typical defamation cases, there was here deliberate use of defamatory material, said even now, after the event, to have been authorized by an agency of government (not simply done by an "unworthy" individual employee) for the very purpose of destroying the influence and effectiveness of an individual. *Barr* was not intended to protect the oppressive use of governmental power. Nor was the rule in *Barr* formulated for the protection of the "unworthy" officer of government. The protection afforded such an officer was given to him, not because he deserved to have it but because of fear that if he was denied it, there might result a deterrent effect upon honest and well intentioned

---

5. Indeed, Heine presented himself in Washington for arrest on the theory that if he were in fact a Communist, he would be guilty of failing to register under the Federal Foreign Agents Registration Act. 22 U.S.C.A. §§ 611–621 (1964) as amend-

ed (Supp.1966). Neither the FBI nor the CIA made any response. N.Y. Times, April 28, 1966, at 29, col. 1; id., April 29, 1966, at 19, col. 1; id., May 14, 1966, at 2, col. 3.

officers of government that would hamper government operation. The premise of *Barr* is that because of human foible officers of government may sometimes unfortunately defame innocent individuals and that protection of such an officer is a necessary evil in order to protect worthy officers from the fear of private civil libel actions. *Barr* envisioned defamation and possible slander as the occasional failures of fallible human beings acting as government officers and not as instruments of governmental policy. I think the immunity conferred in *Barr* has no application to a fact situation where defamation is chosen by a government agency as deliberate policy.[6] That CIA may adopt a policy of defamation for the reason that it thinks such a policy is in the best interest of the United States is implicit in the silence of the Federal Tort Claim Act[7] and the undoubted power of the executive to invoke the "state secrets" privilege in a proper case. All that I would hold is that the individual person who publishes such defamation will not thereafter be entitled to *absolute* executive immunity under the doctrine enunciated in *Barr* as I understand it.

I would reverse and remand to the district court to consider whether or not Raus by reason of his position in the Estonian Legion is entitled to assert the qualified privilege commonly granted to those who have a special interest to preserve. See Prosser, Torts § 110 (3rd ed. 1964). I would also ask the district court to consider whether Heine was such a public figure as to afford defendant the privilege allowed under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. Surely, as the court suggests, one or the other of these ought to be enough.

---

**6.** *See* Comment, 77 Yale L.J. 367, 387 (1967), where in discussing legislative immunity under U.S.Const. art. I, § 6, it is suggested that a defamed person ought to have "redress against conduct that no rationale for the constitutional privilege purports to justify: the exercise of public power with intent to inflict injury on private citizens or with reckless disregard for their interests."

**7.** 28 U.S.C.A. § 2680(h) excludes slander and libel actions.