# SPALDING *v.* VILAS.

ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 81.   Argued November 21, 1895. — Decided March 2, 1896.

It was the duty of the Postmaster General to cause all cheques or warrants issued under the authority of the act of March 3, 1883, c. 119, 22 Stat. 487, and of the act of August 4, 1886, c. 903, § 8, 24 Stat. 256, 307, 308, to be sent directly to the claimants, and it was his right to call their attention to the provisions of the act of 1883; and if the legislation to which attention was thus invited worked injury to an attorney employed by such claimants to present their claims, in that it gave his clients an opportunity to evade, for a time, the payment of what they may have agreed to allow him, it was an injury from which no cause of action could arise.

The Postmaster General was directly in the line of duty when, in order that the will of Congress as expressed in the act of 1883 might be carried out, he informed claimants that they were under no legal obligation to respect any transfer, assignment or power of attorney, which section 3477 of the Revised Statutes declared to be null and void.   If the plaintiff had not taken any such transfers, assignments, or powers of attorney from his clients, he could not have been injured by the reference made by the Postmaster General to that section.   If he had taken such instruments, he cannot complain that the Postmaster General called the attention of claimants to the statute on the subject, and correctly interpreted it.

The act of the head of one of the Departments of the government in calling the attention of any person having business with such Department to a statute relating in any way to such business, cannot be made the foundation of a cause of action against such officer.

The same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law.

THE case is stated in the opinion.

*Mr. W. Willoughby* for plaintiff in error.

*Mr. Assistant Attorney General Dickinson* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This writ of error brings up for review a judgment of the Supreme Court of the District of Columbia in general term, which affirmed a final order in the same court in special term, sustaining a demurrer to the declaration filed by the plaintiff in error Spalding against the defendant Vilas, and dismissing the plaintiff's action.

The question presented for determination is whether the plaintiff's declaration stated a valid cause of action against the defendant.

The plaintiff alleged that he was a citizen of the District of Columbia, and had been for more than twenty years an attorney-at-law, practising his profession in the city of Washington, and that the defendant, from March 4, 1885, until January 16, 1888, was the Postmaster General of the United States ;

That " in or about the year 1871, he, the said plaintiff, was employed by a considerable number of persons, who were and had been postmasters at different post offices in the United States, to obtain a review and readjustment of their salaries, in accordance with the provisions of the act of Congress of June 12, 1866, relating thereto, and which enacted that when the quarterly returns of the postmasters of the third, fourth, and fifth classes, mentioned therein, showed that their salary allowed is ten per centum less than it would be on the basis of commissions under the act of June 22, 1854, fixing their compensation, they were entitled to have their compensation reviewed and readjusted under the provisions of said act of 1854, by reason of which a large number of such postmasters had just and valid claims against the United States arising from such readjustment, and a large number of them entered into written contracts with the plaintiff, employing him, and providing a reasonable compensation to him for procuring the same, and gave to him written powers of attorney to act for them in the prosecution of said claims and to receive the drafts which might be issued in payment thereof ; " and,

That " upon making and filing applications at the Post

Office Department in behalf of his clients for such readjustment and review, the same was denied, notwithstanding such act of Congress, whereupon the plaintiff took measures to procure mandatory legislation by Congress and appropriations necessary, pressing such legislation by all lawful means in his power in the different Congresses from 1871 to 1886, giving to such efforts a great amount of his time, and in the meantime procuring similar contracts and applications and powers of attorney from several thousands of postmasters of the said classes throughout different parts of the United States, and filing in the Post Office Department such applications and powers of attorney, and expending a good many thousands of dollars in building up a business in the collection of such claims, relying upon the justice thereof, and finally obtaining the passage of the acts of Congress of March 3, 1883, requiring the Postmaster General of the United States, upon proper presentation of such claims, to compute and pay the same; an act of Congress of July 7, 1884, making appropriations for the payment of such claims; a further act of Congress of March 3, 1885, making a like appropriation; and a similar act of Congress of August 4, 1886, making further appropriations therefor, all of which acts were brought about in consequence of the continual and persistent efforts of the plaintiff, under which acts the plaintiff proceeded to make out papers and proofs for the presentation of such claims in behalf of his clients, and filed the same, with powers of attorney to him, as aforesaid, in the said Post Office Department, and commenced the collection of the same, a large number of said claims prior to March, 1885, and which were good and valid, being, however, repudiated by the Post Office Department, and the prosecution of such claims being made more difficult by great hostility of the persons managing such department to the collection of this class of claims;"

The declaration also alleged that "soon after the 3d day of March, 1885, the plaintiff made application to the defendant, in his capacity of Postmaster General of the United States, to adjust and pay the said claims which had been disallowed, and also to review and readjust claims of the same character

which had not before been presented, which applications were refused, and an acrimonious controversy arose between the said defendant and this plaintiff in relation thereto, the said defendant, among other things, endeavoring to obtain legislation by Congress to impair and destroy the rights of the plaintiff under the said contracts, in which, however, he failed; but to further harass the plaintiff, and to injure him in his good name and in his business, without any good reason therefor, and with malicious intent, the said defendant interposed all possible obstacles to the collection of said claims, and undertook to induce the clients of the plaintiff to repudiate the contracts they had made, and for such purpose, and with such malicious intent, caused the drafts for the payment of such claims to be sent directly to the claimants, and for the malicious purpose of causing the claimants to disregard the contracts they had made with the plaintiff for fees, and to cause them to believe that the same were null and void, and that plaintiff had rendered them no service, and that he was attempting falsely to claim for valuable services rendered under said contracts, falsely claimed to be valid, and using his official character for such purpose, thus placing the plaintiff before the country as a common swindler; and to bring him into public scandal, infamy, and disgrace, and to injure his business, with each letter of transmittal of drafts to said claimants caused to be issued and sent to them, between September, 1886, and January 17, 1888, to a great number, to wit, four thousand of the said claimants, clients of the plaintiff, residing in the States of New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia, Wisconsin, and the Territories of Utah, Washington, and Wyoming, the circular, of which the following is a copy, the same being dated and addressed to each claimant, respectively, stating the sum transmitted and the name and post office of such claimant, respectively, and having added thereto, in print, section 8 of the act of August 4, 1886, and section 3477 of the Revised Statutes of the United States, to wit:

"Post Office Department,

"Office of the Third Assistant Postmaster General,

"Division of Finance, Washington, D. C.,——, 188–.

"Sir: Herewith inclosed you will find warrant payable to your order for $——, which is in full liquidation of your claim for the balance unpaid of the readjusted salary of —— ——, postmaster at ——, State of —— .

"In transmitting it I am directed by the Postmaster General to advise you that in the act of 1883, which provided for readjustments of salary, the Congress directed that all checks or warrants should be made payable to the claimants and transmitted direct to them, and that in the appropriation and enactment on this subject by Congress, a copy of which is printed at the foot of this note, the direction was repeated. This was done because no attorney's services were necessary to the presentation of the claim before the department, and the Congress desired all the proceeds to reach the person really entitled thereto. After a claim of this character is filed in the department its examination and the readjustment of the salary, if found proper, are made directly from the books and papers in the department by its officers, and without further evidence.

"You are further advised that by section 3477 of the Revised Statutes, a copy of which is also printed at the foot of this note, any transfer of this claim or power of attorney for receiving payment of this warrant is null and void.

"Yours respectfully, J. H. Harris,

"*Third Assistant Postmaster General.*

"—— ——,

"——— ——— .

"See statutes referred to on next leaf;"

It was alleged that the said circular was intended to deceive and did deceive the said claimants, who believed what the defendant meant and intended, as hereinbefore stated, of and concerning the plaintiff, and was false in the following respects, to wit: (1) that "in the act of 1883, which provided for readjustments of salary, the Congress directed that all

cheques or warrants should be transmitted direct to the claimants, and that such direction was repeated in the act of 1886;" (2) that "this was done because no attorney's services were necessary to the presentation of the claim before the department;" (3) that "this was done because the Congress desired all the proceeds to reach the person really entitled thereto;" (4) that "the statement that claims of this character, after being filed in the department, were examined and readjusted directly from the books and papers in the department, without further evidence, besides being untrue, in many cases was unnecessary to protect the interests of the government or the claimant, was not required by law, and was maliciously intended to cause the claimants to believe that the plaintiff's claim for valuable services was false and fraudulent, and the same was inserted for no other purpose."

The declaration further alleged that "the reference to section 3477 in said circular, and the printing of the whole of said section, was for the malicious purpose only of causing the claimants to believe that the said contracts for fees, before suggested in said circular, were null and void according to a pretended official ruling of the Post Office Department; while in truth and in fact the said section had no reference to any contracts of the kind, nor to contracts of the character hereinbefore described as made by the plaintiff with such claimants;" that "all of said false statements or irrelevant references and printing of said section 3577 of the Revised Statutes were unnecessary, malicious, and without reasonable or probable cause, and intended to deceive the claimants, and to thereby induce them to repudiate the contracts they had made with the plaintiff, and they understood said circular as meant and intended, as herein stated, of and concerning the plaintiff; and they were deceived, and did repudiate their said contracts by reason thereof, to the great injury of the good name of the plaintiff and to his business, and for no other purpose;" and that "soon after commencing to issue such circulars the attention of the defendant was called by the plaintiff to the fact that the issuing of such circulars produced great injury to his business and was unjust towards him; but the said defendant,

notwithstanding, maliciously continued the said issue, so long as he held the position of Postmaster General of the United States, to all the claimants he could reach, and to the number of four thousand, as aforesaid, for no other purpose than to continue the said injury to this plaintiff."

In consequence of the alleged acts of the defendant the plaintiff claimed to have been put to great trouble and expense in enforcing the said contracts, had lost the benefit of many of them, at an expense and loss of $25,000; and, besides, had suffered injury to his good name and reputation to the amount of $75,000. He prayed judgment for $100,000, besides costs and disbursements.

Section 3477 of the Revised Statutes referred to in the circular made part of the declaration is as follows: "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due and the issuing of a warrant for the payment thereof. Such transfers, assignments and powers of attorney must recite the warrant for payment, and must be acknowledged by the person making them before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment or warrant of attorney to the person acknowledging the same."

The thought which underlies the entire argument for the plaintiff is that the circular issued from the Post Office Department, by direction of the Postmaster General, was beyond the scope of any authority possessed by that officer; and, therefore, the sending of the circular to the persons who had presented claims against the government was not justi-

fied by law, and would not protect the Postmaster General from responsibility for the injury done to the plaintiff from that act.

The statute of March 3, 1883, c. 119, 22 Stat. 487, relating to the readjustment of the salaries of postmasters of certain classes, provided that every readjustment of salary, under that act, should be upon a written application, signed by the postmaster, or late postmaster, or legal representative entitled to such readjustment, and that " each payment made shall be by warrant or check on the treasurer or some assistant treasurer of the United States, made payable to the order of said applicant, and forwarded by mail to him at the post office within whose delivery he resides, and which address shall be set forth in the application above provided for." And, by the act of August 4, 1886, c. 903, § 8, 24 Stat. 256, 307, 308, it was declared that the payment of all sums thereby appropriated " shall be made by warrants or cheques, as provided by the said act of March 3, 1883, payable to the order of and transmitted to the persons entitled respectively thereto."

Whatever may have been the value of any services rendered by the plaintiff for his clients ; even if the readjustment of their salaries was wholly due to his efforts " to procure mandatory legislation by Congress, pressing such legislation by all lawful means in his power," through many years, it was competent for the legislative branch of the government to provide that any sums ascertained to be due to claimants should be paid directly to them. Such a requirement could have had no other object than to make it certain that the full amount due to those whose salaries were readjusted was received by them personally, and should not pass through the hands of agents or attorneys. No one will question the power of Congress to enact legislation that would effect such an object. *Ball* v. *Halsell, ante,* 72. If such legislation worked injury to the plaintiff in that it gave his clients an opportunity to evade, for a time, the payment of what they may have agreed to allow him, it was an injury from which no cause of action could arise. This view is so clear that no argument in its support is necessary.

It results that the Postmaster General not only had the right, but it was his duty, to cause all cheques or warrants, issued under the authority of the above acts of Congress, to be sent directly to the claimants. If not strictly his duty, it was his right to call the attention of claimants to the provisions of the act of 1883. Of the legislation of Congress every one is presumed to have knowledge; but all know, as matter of fact, that the larger part of the people are not informed as to the provisions of many acts of Congress. No one could rightfully complain that the Postmaster General called the attention of those having business with his Department to an act of Congress that related to that business, and which would explain why cheques or warrants, in their favor, were sent directly to them, and were not delivered to agents or attorneys.

Nor did the Postmaster General exceed his authority when he informed claimants that Congress required cheques or warrants to be sent to them " because no attorney's services are necessary to the presentation of the claim before the Department, and Congress desired all the proceeds to reach the person really entitled thereto;" nor when he stated in his circular that " after a claim of this character is filed in the Department, its examination and the readjustment of salary, if found proper, are made directly from the books and papers in the Department by its officers, and without further evidence." Was it not true that any claim, under these acts of Congress must be, or could properly be, sustained or rejected according to the evidence furnished by the records of the Department? Besides, the statement that " no attorney's services were necessary to the presentation of the claim," if not strictly accurate, was, at most, only an expression of the opinion of the Postmaster General in the course of his official duties. As he was charged with the execution of the will of Congress in relation to the readjustment of those salaries, he was entitled to express his opinion as to the object for which the act of 1883 was passed, and to indicate what, in his judgment, was necessary to be done in order to bring claims under that act properly before the Department. Indeed, the clear indication in

the act of 1883 of the desire of Congress that the full amount awarded to claimants should be paid directly to them, rendered it entirely appropriate that he should advise them of the fact that the records of the Department furnished all the evidence necessary for the readjustment directed by Congress. He did not by his circular advise claimants that they could disregard any valid contract made by them with attorneys. Claimants could not have understood him as recommending a violation of the legal rights of others. He said, in substance, nothing more than that they, the claimants, were mistaken if they supposed that the services of attorneys were required for the presentation and prosecution of their claims before the Department.

Equally without foundation is the suggestion that the Postmaster General exceeded his authority and duty when he called the attention of claimants to section 3477 of the Revised Statutes. That officer might well have apprehended that the salutary provisions of that section had been overlooked or disregarded by those interested or connected with the prosecution of these claims. If any claimant had transferred or assigned his claim, or any part of it, or any interest therein, or had executed any power of attorney, order or other instrument for receiving payment of such claim, or any part of it, before the claim was allowed, and before its amount was ascertained and a warrant for its payment issued, such transfer, assignment and power of attorney were null and void. The Postmaster General was directly in the line of duty when, in order that the will of Congress as expressed in the act of 1883 might be carried out, he informed claimants that they were under no legal obligation to respect any transfer, assignment, or power of attorney, which section 3477 of the Revised Statutes declared to be null and void. If the plaintiff had not taken any such transfers, assignments, or powers of attorney from his clients, he could not have been injured by the reference made by the Postmaster General to that section. If he had taken such instruments, he cannot complain that the Postmaster General called the attention of claimants to the statute on the subject, and correctly interpreted it.

The act of the head of one of the departments of the government in calling the attention of any person having business with such department to a statute relating in any way to such business, cannot be made the foundation of a cause of action against such officers.

If, as we hold to be the case, the circular issued by the Postmaster General to claimants under the acts of. Congress in question was not unauthorized by law, nor beyond the scope of his official duties, can this action be maintained because of the allegation that what the officer did was done maliciously?

This precise question has not, so far as we are aware, been the subject of judicial determination. But there are adjudged cases, in which principles have been announced that have some bearing upon the present inquiry.

In *Randall* v. *Brigham*, 7 Wall. 523, 535 — which was an action against one of the Justices of the Superior Court of Massachusetts for an alleged wrongful removal of the plaintiff from his office of an attorney and counsellor at law — it was said that whatever might be the rule in respect of judges of limited and inferior authority, judges of superior or general authority were not liable to civil actions for their judicial acts, even when such acts were in excess of their jurisdiction, "unless, perhaps, where the acts, in excess of jurisdiction, are done maliciously or corruptly."

But in *Bradley* v. *Fisher*, 13 Wall. 335, 350, 351 — which was an action against a Justice of the Supreme Court of the District of Columbia to recover damages alleged to have been sustained by the plaintiff "by reason of the wilful, malicious, oppressive and tyrannical acts and conduct" of the defendant, whereby the plaintiff was deprived of his right to practise as an attorney in that court — it was said that the qualifying words, above quoted, were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction were not liable to civil suits for their judicial acts, even when such acts were in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction was made between excess of jurisdiction and the clear absence of all jurisdiction over the subject-mat-

ter, the court observing that " where there is clearly no juris-
diction over the subject-matter, any authority exercised is a
usurped authority, and for the exercise of such authority,
when the want of jurisdiction is known to the judge, no ex-
cuse is permissible. In this country," the court said, " the
judges of the superior courts of record are only responsible to
the people, or the authorities constituted by the people,
from whom they receive their commissions, for the manner in
which they discharge the great trusts of their office. If in
the exercise of the powers with which they are clothed as
ministers of justice, they act with partiality, or maliciously,
or corruptly, or arbitrarily, or oppressively, they may be called
to an account by impeachment and suspended or removed
from office." Again: " The exemption of judges of the supe-
rior courts of record from liability to civil suit for the judicial
acts existing when there is jurisdiction of the subject-matter,
though irregularity and error attend the exercise of the juris-
diction, cannot be affected by any consideration of the motives
with which the acts are done. The allegation of malicious
or corrupt motives could always be made, and if the motives
could be inquired into judges would be subjected to the same
vexatious litigation upon such allegations, whether the motives
had or had not any real existence."

In *Yates* v. *Lansing*, 5 Johns. 282, 291, Kent, C. J., said:
" The doctrine which holds a judge exempt from a civil suit
or indictment for any act done or omitted to be done by him,
sitting as a judge, has a deep root in the common law. It is
to be found in the earliest judicial records, and it has been
steadily maintained by an undisputed current of decisions
in the English courts, amidst every change of policy, and
through every revolution of their government."

The same principle was announced in England in the case
of *Fray* v. *Blackburn*, 3 B. & S. 576, in which Mr. Justice
Crompton said: " It is a principle of our law that no action
will lie against a judge of one of the superior courts for a judi-
cial act, though it be alleged to have been done maliciously
and corruptly; therefore, the proposed allegation would not
make the declaration good. The public are deeply interested

in this rule, which, indeed, exists for their benefit, and was es-
tablished in order to secure the independence of the judges and
prevent them from being harassed by vexatious actions." The
principle was applied in one case for the protection of a county
court judge, who was sued for slander, the words complained
of having been spoken by him in his capacity as judge, while
sitting in court, engaged in the trial of a cause in which the
plaintiff was defendant. Chief Baron Kelly observed that a
series of decisions, uniformly to the same effect, extending
from the time of Lord Coke to the present time, established
the general proposition that no action will lie against a judge
for any acts done or words spoken in his judicial capacity in
a court of justice, and that the doctrine had been applied to
the court of a coroner, and to a court-martial, as well as to the
superior courts. He said: " It is essential in all courts that
the judges who are appointed to administer the law should be
permitted to administer it under the protection of the law,
independently and freely, without favor and without fear.
This provision of the law is not for the protection or benefit
of a malicious or corrupt judge, but for the benefit of the pub-
lic, whose interest it is that the judges should be at liberty to
exercise their functions with independence and without fear
of consequences. How could a judge so exercise his office if
he were in daily and hourly fear of an action being brought
against him, and of having the question submitted to a jury
whether a matter on which he had commented judicially was
or was not relevant to the case before him?" *Scott* v. *Stans-
field,* L. R. 3 Ex. 220, 223.

In *Dawkins* v. *Lord Paulet,* L. R. 5 Q. B. 94, 114, which
was an action for libel brought by an officer of the army
against his superior officer to recover damages on account of
a report made by the latter in relation to certain letters of the
former, the defendant claimed that what he did was done in
the course of and as an act of military duty. The replication
stated that the libel was written by the defendant of actual
malice, without any reasonable, probable or justifiable cause,
and not *bona fide* or in the *bona fide* discharge of the defend-
ant's duty as such superior officer. The case was heard on

demurrer to the replication, and it was held by all the justices (Cockburn, C. J., only dissenting) that the action would not lie. The case was first considered in the light of the pleadings and the admissions of the demurrer. Mellor, J., said: "I apprehend that the motives under which a man acts in doing a duty which it is incumbent upon him to do, cannot make the doing of that duty actionable, however malicious they may be. I think that the law regards the doing of the duty and not the motives from or under which it is done. In short, it appears to me, that the proposition resulting from the admitted statements in this record amounts to this: Does an action lie against a man for maliciously doing his duty? I am of opinion that it does not; and, therefore, upon the pleadings as they stand we might give judgment for the defendant." But, according to the report of that case, the Attorney General did not rest the defence on the effect of the admissions in the pleadings, but contended broadly that no action would lie against an officer of the army charged with duties such as those stated on the record, for the discharge of them. He likened the case to that of the judges of courts of law, to grand jurymen, petty jurymen, and to witnesses, against whom no action lies for what they do in the course of their duty, however maliciously they may do it, and claimed immunity for the defendant for the acts done in the course of his duty on the highest grounds of policy and convenience. No judge, no jury, nor witness, he said, "could discharge his duty freely if not protected by a positive rule of law from being harassed by actions in respect of the mode in which he did the duty imposed upon him, and he contended that the position of the defendant manifestly required the like protection to be extended to him and to all officers in the same position." "There is," Mellor, J., said, "little doubt that the reasons which justify the immunity in the one case do in great measure extend to the other."

An instructive case upon the general subject of the immunity of public officers from actions for damages on account of what they may have done in the course of their official duties is *Dawkins* v. *Lord Rokeby*, L. R. 8 Q. B. 255, 262, the judg-

ment in which was affirmed by the House of Lords. L. R. 7 H. L. 744, 754. The defendant, a general in the English army, was called before a court of inquiry, legally assembled to inquire into the conduct of the plaintiff, also an officer in the army. He made statements in evidence, and after the close of the evidence, handed in a written paper (not called for by the court, but having reference to the subject of the inquiry) as to the conduct of that officer. An action was brought in respect of those statements, which were alleged to be both untrue and malicious. That case came before the Queen's Bench, in the Exchequer Chamber, upon a bill of exceptions allowed by Mr. Justice Blackburn, who had instructed the jury as matter of law that the action would not lie, if the verbal and written statements complained of were made by the defendant, being a military officer, in the course of a military inquiry, in relation to the conduct of the plaintiff, he being also a military officer, and with reference to the subject of that inquiry ; and this even though the plaintiff should prove that the defendant had acted *mala fide*, and with actual malice, and without any reasonable or probable cause, and with the knowledge that the statements made and handed in by him were false. The court, all the judges concurring, sustained the correctness of this ruling, and held that the statements were privileged. " The authorities," it was said, " are clear, uniform and conclusive, that no action of libel or slander lies, whether against judges, counsel, witnesses or parties, for words written or spoken in the ordinary course of any proceeding before any court or tribunal recognized by law." Lord Chancellor Cairns, in the House of Lords, said : " Adopting the expressions of the learned judges with regard to what I take to be the settled law as to the protection of witnesses in judicial proceedings, I certainly am of opinion that upon all principles, and certainly upon all considerations of convenience and public policy, the same protection which is extended to a witness in a judicial proceeding who has been examined on oath ought to be extended, and must be extended, to a military man who is called before a court of inquiry of this kind for the purpose of testifying there upon a matter of

military discipline connected with the army. It is not denied that the statements which he made, both those which were made *viva voce* and those which were made in writing, were relative to the inquiry."

We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision. Whatever difficulty may arise in applying these principles to particular cases, in which the rights of the citizen may have been materially impaired by the inconsiderate or wrongful action of the head of a Department, it is clear — and the present case requires nothing more to be determined — that he cannot be held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority, by reason of any personal motive that might be alleged to have prompted his action; for, personal motives cannot be imputed to duly authorized official conduct. In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such

large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals. In the present case, as we have found, the defendant, in issuing the circular in question, did not exceed his authority, nor pass the line of his duty, as Postmaster General. The motive that impelled him to do that of which the plaintiff complains is, therefore, wholly immaterial. If we were to hold that the demurrer admitted, for the purposes of the trial, that the defendant acted maliciously, that could not change the law.

The judgment of the Supreme Court of the District of Columbia is

*Affirmed.*