Jeremy **GROSSMAN**

v.

Jenean **McKAY.**

Civ. No. 74–535–HM.

United States District Court,
D. Maryland.

Nov. 19, 1974.

James D. Newton, Silver Spring, Md., for plaintiff.

George Beall, U. S. Atty. and Robert A. Rohrbaugh, Asst. U. S. Atty., Heidi A. Dellafera, Atty., Dept. of Health, Education and Welfare, Washington, D. C., for defendant.

HERBERT F. MURRAY, District Judge.

This case is before the Court on a motion to dismiss or, in the alternative, a motion for summary judgment. In view of the fact that matters outside the pleadings have been presented for consideration by the Court, under the authority of Rule 12(b) of the Federal Rules of Civil Procedure, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.

Defendant, Jenean McKay, a federal government employee, contends that as a matter of law she is immune from liability for alleged defamatory statements made to another government employee concerning a Quickhand stenographic course offered by the plaintiff, Jeremy Grossman.

From the pleadings, defendant's deposition and affidavits filed by both sides, the following facts appear.

In November, 1973, defendant, an employee Development Specialist in the Training Education Branch of the Office of Personnel Management at the National Institutes of Health (hereinafter NIH), received a letter from plaintiff, operator of a business known as Employee Development Systems (hereinafter EDS), describing a new programmed instruction course in alphabetic shorthand (Quickhand) which was being taught at other Government agencies in Washington. The course was advertised to require only thirty hours of classroom training for successful completion—successful in the sense that those who completed the course would qualify for the Civil Service Commission requirement of eighty words per

minute.[1] Defendant responded to the letter by requesting further information concerning plaintiff's course. David Goldstein, an EDS salesman, in response to Ms. McKay's request, referred her to a David Barry of the Internal Revenue Service (hereinafter IRS), Peter Schindler of the Commerce Department and Carol Yascowitz of the Pentagon for a critique on the merits and success of the course.

On or about January 21, 1974, defendant contacted the personnel management office of the IRS and asked to speak with the person responsible for the development and planning of their training courses. Instead of being referred to Mr. Barry, the man suggested by Goldstein, defendant was referred to Ms. Terri Lazarus. During the ensuing conversation, which lasted for at least fifteen minutes according to defendant's deposition, defendant was informed by Ms. Lazarus that the Quickhand course had been taught at IRS and that Mr. Grossman had given his students their eighty words per minute proficiency certificates. Ms. Lazarus stated that sometime after completion of the course it was discovered that his students were unable to take dictation satisfactorily. She also noted that the Civil Service Commission had recommended that the Quickhand students participate in a new course on a different shorthand system although their proficiency certificates were not being revoked. Toward the conclusion of this conversation, defendant gave Ms. Lazarus the names of the other references supplied her by Mr. Goldstein.

Before contacting the other references, defendant received a telephone call from Ms. Lazarus in which the latter requested that defendant send her a memorandum concerning the information supplied defendant by Goldstein. Defendant learned during this conversation that Ms. Lazarus had spoken to both Peter Schindler and Carol Yascow-

itz, the two outstanding references on defendant's list, concerning the Quickhand course. Mr. Schindler, according to Ms. Lazarus, had stated that Quickhand had been taught satisfactorily at the Commerce Department for a period of fifty-six hours and not the advertised thirty hours. Ms. Yascowitz, according to Ms. Lazarus' recounting of the conversation, had stated that the Pentagon was still considering using Quickhand but had not come to a final conclusion at that time. In her deposition, defendant stated that she herself did subsequently contact Carol Yascowitz but never spoke with Peter Schindler personally.

On or about January 30, 1974, David Goldstein once again called defendant, and at this time he gave her two additional references, Barbara Stannard of the Social and Economic Statistics Administration (hereinafter SESA) and Robert Harris of the National Oceanic and Atmospheric Administration (hereinafter NOAA).

As a result of the January 30th call, defendant, on or about February 4, 1974, called Ms. Stannard for a critique of the Quickhand course. The motivation for this call, according to her affidavit and deposition, was that despite the negative reports received from Ms. Lazarus, defendant was still considering the possibility of recommending plaintiff's course at NIH.

After introducing herself and explaining the reason for the call, defendant was informed by Ms. Stannard that she was not familiar with the Quickhand course. Defendant then briefly explained the course and mentioned that Mr. Grossman would be the instructor. With this information, Ms. Stannard replied that she knew Mr. Grossman and that he was to begin a course in ABC Stenoscript within the next few days at SESA. Defendant states that Barbara Stannard informed her that she had not been impressed with Mr. Grossman when she had previously interviewed

1. The relative importance of this feature lies in the fact the ABC Stenoscript course which they were then offering at NIH required six-ty hours of classroom instruction in order to qualify for the same Civil Service Commission requirement.

him for a training position at SESA and that his services to teach the ABC Stenoscript course were retained through the office of the Secretary of the Commerce Department, not through the personnel management office at SESA.

In response to this disclosure, defendant relayed to Ms. Stannard the information she had received from Ms. Lazarus concerning the IRS experience and the comments of Peter Schindler and Carol Yascowitz.

It is primarily this conversation between defendant and Barbara Stannard at SESA which forms the basis of this suit. Plaintiff in his complaint and in the affidavit filed in opposition to defendant's motion alleges that when he reported to SESA, on or about February 13, 1974 for an orientation session with the SESA officials, he was informed by Ms. Stannard that defendant had told her that he, plaintiff, had falsified Civil Service records in that he had certified as qualified students who had not passed a shorthand transcription test, and further that the Civil Service Commission proposed to revoke the proficiency certificates of the students so certified. Throughout the course of the pleadings and papers filed in this action, defendant denies that she ever made any false or malicious comments concerning the Quickhand course and denies ever telling Barbara Stannard that plaintiff falsified Civil Service records in the manner alleged, or that the Civil Service Commission was considering revoking the students' proficiency certificates.

Plaintiff claims that as a result of these alleged defamatory remarks Barbara Stannard cancelled the contracts made by SESA with the plaintiff and that he has lost additional government business as well.

Before passing to the merits of the motion for summary judgment, some additional facts which appear from the supporting papers should be mentioned.

On or about February 4, 1974, defendant contacted Robert Harris at NOAA.

She was told at this time that Quickhand was going to be taught at this agency, and that she was welcome to call back at the conclusion of the course for Mr. Harris' evaluation. Defendant did in fact call Mr. Harris again on or about May 3, 1974, and was informed that Mr. Harris would not recommend the course as a result of student dissatisfaction.

Finally, as a result of her investigation, defendant concluded that she could not recommend Quickhand to her superiors. Apparently as a result of her decision not to recommend, the decision was made by defendant's superiors not to accept Mr. Grossman's offer to teach the Quickhand course at NIH.

The question before the Court on this motion is whether the defendant, under the facts of this case and taking all inferences therefrom in favor of the plaintiff, is entitled as a matter of law to a judgment in her favor by virtue of the doctrine of governmental immunity.

Defendant McKay contends that, under the authority of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), reh. denied, 361 U.S. 855, 80 S. Ct. 41, 4 L.Ed.2d 93 (1959), and related cases, plaintiff's case against her is barred in that all her actions were performed under the color of office and well within the scope of her duties. She therefore urges the Court to cloak her actions with absolute immunity and thereby vest her with protection not only from any possible recovery which might be had but also from the very prosecution of the charge itself against her.

In his opposition to defendant's motion, plaintiff Grossman vehemently argues that the absolute privilege of Barr v. Matteo, *supra* is limited in its protective scope to governmental "officials" who occupy positions requiring the exercise of executive discretion. Defendant McKay, plaintiff contends, is merely a governmental employee without discretionary powers, and, therefore, not within the protective penumbra of the absolute privilege recognized in *Barr*.

In considering defendant's motion, the Court must at the outset respond to this threshold question raised by plaintiff.

■ In one sense, the plaintiff makes a valid point. It is readily recognized that absolute immunity must not and does not vest in an individual merely because he or she is a government employee. The very terms *executive* or *official* immunity used to designate the privilege suggest that there is a limitation to the immunity afforded and that it will not be automatically applied to the vast class of government employees.

Furthermore, the Court takes cognizance of the fact that the judiciary in creating [2] and shaping this privilege has always been most scrupulous in safeguarding the rights of private or nongovernmental individuals.

As stated by the Fifth Circuit in Norton v. McShane, 332 F.2d 855, 857 (5th Cir. 1964), *citing* Barr v. Matteo, *supra,* and Gregoire v. Biddle, 177 F.2d 579 (2nd Cir. 1949):

> Any case involving the doctrine of executive or official immunity requires the court to resolve a sharp conflict between two important considerations: the protection of the individual citizen against damage caused by oppressive or malicious action on the part of public officers, and the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits based on acts done in the exercise of their official responsibilities.

Such "balancing of interests" would not be required if the privilege were deemed to extend to all acts of all government employees. This clearly is not the intent of the doctrine. Reserving discussion of the doctrine's built-in pro-

tective mechanism of "scope of authority" for later analysis, the Court now deals with what it considers to be the threshold protective device. Phrased in interrogatory fashion, the formulated inquiry becomes—to whom does the immunity extend?

■ In a recent decision, Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973), the Supreme Court held that "the official immunity doctrine . . . confers immunity on government officials of suitable rank . . . ." The *Doe* Court went further to note that:

> In the *Barr* case, the Court reaffirmed existing immunity law but made it clear that the immunity conferred might not be the same for all officials for all purposes. *Id.,* at 573, 79 S.Ct., at 1340 * * * Also, the Court determined in *Barr* that the scope of immunity from defamation suits should be determined by the relation of the publication complained of to the duties entrusted to the officer. Barr v. Matteo, *supra,* at 573–574 of 360 U.S., at 1340–1341 of 73 S.Ct. * * *
>
> Because the Court has not fashioned a fixed, invariable rule of immunity but has advised a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweighs the perhaps recurring harm to individual citizens, there is no ready-made answer as to whether [certain federal employees] should be accorded absolute immunity. 93 S.Ct. at 2028–2029.

Therefore, "suitable rank" is not subject to scrutiny under a "fixed invariable rule of immunity." Nevertheless, plaintiff contends that the doctrine applies only to those employees or officers having *executive authority and discre-*

---

**2.** *See* Barr v. Matteo, 360 U.S. at 569, 79 S.Ct. at 1338:

The law of privilege as a defense by officers of government to civil damage suits for defamation and kindred torts has in large part been of judicial making, although the Constitution itself gives an absolute privilege to members of both Houses of Congress in respect to any speech, debate, vote, report, or action done in session.

*tion* or *under a specific direction to do the act complained of.*[3]

The Court, however, is not disposed to adopt these dual criteria for application of the doctrine; to do so would be to "fashion a fixed, invariable rule of immunity" in order to arrive at a "ready-made answer" in contravention of the mandate of "discerning inquiry" announced in Doe v. McMillan, *supra.*[4] *See, e. g.,* Judge Kaufman's decision in Knuemann v. Naranjo, 378 F.Supp. 104 (D.Md.1974).

■ The matter of "suitable rank" is not resolved by mere reference to a government employee's title or Government Service rating. As stated in Barr v. Matteo, 360 U.S. at 572–574, 79 S.Ct. at 1340–1341 (emphasis added):

We do not think that the principle announced in Vilas [5] can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. *The privilege is not a badge or emolument of exhalted office, but an expression of a policy designed to aid in the effective functioning of government.* The complexities and magnitude of [federal] governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

3. Plaintiff's "Memorandum of Points and Authorities in Opposition to Motion to Dismiss, or in the Alternative, for Summary Judgment" addresses a number of cases, initially cited in large part by defendant in support of her motion, which he notes for the Court all deal with immunity vis a vis employees in executive positions within the governmental hierarchy. Barr v. Matteo, *supra* (Acting Director of the Office of Rent Stabilization); Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed. 2d 1454 (Navy Captain, Commander of the Boston Naval Shipyard); Pagano v. Martin, 397 F.2d 620 (4th Cir. 1968) (commanding officer and executive officer of vessel); Porter v. Eyster, 294 F.2d 613 (4th Cir. 1961) (state official exercising delegated quasi judicial discretion). Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) (two successive Attorneys General, Director of Enemy Alien Control Unit and the District Director of Immigration); Bershad v. Wood, 290 F.2d 714 (9th Cir. 1961) (District Director of Internal Revenue and a revenue officer acting pursuant to § 6331, Internal Revenue Code); and Denman v. White, 316 F.2d 524 (1st Cir. 1963) (Treasury Agents acting pursuant to specific statutory authority [18 U.S.C. § 3056]).

4. The Court takes this position although recognizing that in Barr v. Matteo, 360 U.S. at 575, 79 S.Ct. at 1341, there is language looking toward the dual criteria urged by plaintiff.

That petitioner was not required by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition

of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.

Despite this language in *Barr*, the Court is unwilling to attribute to it the significance or interpretation espoused by plaintiff. Rather than cast the doctrine in a fixed mould which might lead to an unmalleable application of the doctrine, the Court would follow the express mandate of Doe v. McMillan, *supra.* It should be noted, however, at this time that the above-quoted language in *Barr* is most applicable to the present matter for reasons which will be discussed *infra.*

5. Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). Petitioner had brought suit against the Postmaster General, alleging that defendant-respondent had maliciously circulated among postmasters information which he knew to be false and which was intended to deceive the postmasters to the detriment of the Plaintiff. The Court sustained a plea by the Postmaster General of absolute privilege, stating that

In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint. *Id.* at 498, 16 S.Ct. at 637.

\* \* \* It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted— the relation of the act complained of to 'matters committed by law to his control of supervision,' Spalding v. Vilas, *supra,* 161 U.S. at page 498, 16 S. Ct. at page 637,—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.

The danger to be avoided, in this Court's opinion, is attributing talismanic significance to use of terms such as "officer," "official" and "hierarchy." The critically pertinent principles which must be adduced from the above quoted language of *Barr* is that the policy of governmental freedom in the exercise of duties must not be and is not rendered impotent by the mere fact that one "up on the hierarchical ladder" has for certain pragmatic reasons delegated the discharge of specific duties to subordinates.

In Heine v. Raus, 399 F.2d 785 (4th Cir. 1968), vacating and remanding 261 F.Supp. 570 (D.Md.1966), defendant, an employee of the Central Intelligence Agency, claimed that he had been instructed to expose plaintiff as a Soviet KGB agent. Plaintiff, a man with an apparent history as a freedom fighter in Estonia, had made films and given lectures which were ostensibly well received by Estonian communities in the United States. Defendant, in addition to his being a CIA agent, was also the National Commander of the Legion of Estonian Liberation. He admitted telling the Board of Directors of the Legion that plaintiff Heine was a Soviet collaborator and that the Legion should sever all ties with him. Heine alleged that as a result of this defamation, his films and lectures were no longer salable and that he was disgraced in the Estonian communities in the United States.

Defendant Raus claimed absolute immunity by virtue of his governmental employment. Then Chief Judge Thomsen of this Court granted defendant's motion for summary judgment on this ground.

The decision was appealed to the Fourth Circuit Court of Appeals, which, after reviewing the matter, vacated the district court's ruling and remanded for further findings of fact on the issue of whether or not the Director of the CIA or a Deputy Director or a subordinate official, having authority to do so, authorized, approved or ratified the instructions to expose plaintiff's alleged Soviet collaboration.

However, in accepting then Chief Judge Thomsen's determination that the agent, who was not an executive or official within the government, could be absolutely immune from plaintiff's cause of action, the Fourth Circuit stated:

If, in defamation cases, recognition of an absolute privilege for judges, legislators and highly placed executive officers of the government, when acting in line of duty, is to serve its intended purpose, it must extend to subordinate officials and employees who execute the official's orders. \* \* \* If the circumstances impose a compelling moral obligation upon the superior to defend and indemnify the subordinates, immunization of the superior alone from direct defamation actions would be a useless formalism.

Recognition of an absolute privilege of the subordinate by attribution of the superior thus appears to be a necessary corollary of the superior's privilege. It is generally recognized that an agent, acting within the scope of his authority, does have whatever privilege the principal would have enjoyed if he had acted for himself. The principle is applicable in defamation actions and, if an authorized agent would have been privileged, subsequent ratification confers the privilege upon an unauthorized agent. \* \* \*

We conclude that the absolute privilege is available to Raus if his in-

structions were issued with the approval of the Director or of a subordinate authorized by the Director, in the subordinate's discretion, to issue such instructions, or if the giving of the instructions was subsequently ratified and approved by such official. *Id.* at 790–791.

On reconsideration, 305 F.Supp. 816 (D.Md.1969), the District Court, after obtaining further factual information, held that summary judgment again should be entered for defendant. This ruling was summarily affirmed by the Fourth Circuit. 432 F.2d 1007 (4th Cir. 1970), cert. denied, 402 U.S. 914, 91 S. Ct. 1368, 28 L.Ed.2d 658 (1971).

In the matter now before the Court, defendant McKay could not be classified as an officer or executive in the Office of Personnel Management at NIH or even in that office's subdivision, the Training Education Branch. According to her deposition, included in her various duties is the yearly immediate supervision of approximately fifty training development courses offered to NIH employees. In addition to this duty, she is singly responsible for the investigation and critiquing of new training techniques and programs. She estimated that in 1973, there were approximately a "half dozen or so" such courses, including plaintiff's Quickhand course, requiring her attention.

She stated that the decision as to whether a contract for such new training programs would be accepted or rejected was not hers to make. Her function relative to such courses was to merely search out information, critique and evaluate each course from the information obtained, and to forward her recommendation of acceptance or rejection through her immediate supervisor, W. Elbert Wilson, to the Assistant Director of the Training Education Branch, Robert S. Philleo.

The final decision as to each contract was then made by Mr. Philleo and, possibly, by the Director of the Office of Personnel Management, John M. Sangster.

The statutory authority for such governmental training programs is found in Chapter 41, Title 5 of the United States Code, which provides in pertinent part:

4103. Establishment of training programs.—In order to increase economy and efficiency in the operations of the agency and to raise the standards of performance by employees of their official duties to the maximum possible level of proficiency, the head of each agency, in conformity with this chapter, shall establish, operate, and maintain a program or programs, and a plan or plans thereunder, for the training of employees in or under the agency by, in and through Government facilities and non-Government facilities. Each program, and plan thereunder, shall—

(1) conform to the principles, standards, and related requirements contained in the regulations prescribed under section 4118 of this title

5 U.S.C. § 4118 provides in pertinent part that:

Regulations.—(a) The Civil Service Commission, after considering the needs and requirements of each agency for training its employees and after consulting with the agencies principally concerned, shall prescribe regulations containing the principles, standards, and related requirements for the programs, and plans thereunder . . . . The regulations also shall cover—

(1) requirements concerning the determination and continuing review by each agency of its training needs and requirements;

(2) the scope and conduct of the agency training programs and plans;

(6) the interchange of training information among the agencies;

(9) other matters considered appropriate or necessary by the Commission to carry out the provisions of this chapter. . . .

(b) In addition to the matters set forth by subsection (a) of this sec-

tion, the regulations, concerning training of employees by, in, or through non-Government facilities,[6] shall—(1) prescribe general policies governing the selection of a non-Government facility to provide training.

Pursuant to 5 U.S.C. § 4118, regulations governing in large part the matters specified were promulgated and are found in 5 C.F.R., Chap. I, Part 410. This section provides in pertinent part as follows:

> Section 410.301 Scope and General Conduct of training programs.
>
> (a) The head of an agency shall determine the policies which are to govern the training of employees of the agency. These policies shall be set forth in writing [7] and include a statement of the broad purposes for which training will be given and of the assignment of responsibilities for seeing that these purposes are achieved.
>
> (b) The head of the agency also shall take such administrative action as is necessary to assure that:
>
> (2) Priorities are established for the training programs of the agency.

Pursuant to the statutory mandate to prescribe regulations to cover the general policies governing the selection of a non-Government facility to provide training [5 U.S.C. § 4118(b)(1)], the Civil Service Commission, under 5 C.F.R. § 410.502, directed that

> (a) An agency shall use as the principal criterion for selection of non-Government training facilities the ability of the facilities to meet the training needs of the agency effectively, economically, and in timely fashion.

It is clear to the Court upon review of the above statutory and regulatory language that there was more than sufficient authority for *someone* to perform the evaluation and critiquing of Quickhand as a training course offered by a non-Government facility within the meaning of the statute. It seems equally clear to the Court, and was recognized by plaintiff at the time of oral argument, that the responsibility for the carrying out of these duties in the case of training facilities offered at NIH, rested at least with the Office of Personnel Management. Furthermore, it appears that the branch or subdivision known as the Training Education Branch of the Office of Personnel Management was the immediate body responsible for the discharge of the statutory and regulatory mandates outlined above.

If, as Barr v. Matteo states, the "privilege is not a badge or emolument of exhalted office, but an expression of a policy designed to aid in the effective functioning of government," [8] then the immunity afforded by the privilege would extend to the individual assigned the duties prescribed initially by Congress, subsequently by the Civil Service Commission, and ultimately by the Training Education Branch of the Office of Personnel Management at NIH. As further recognized in Barr v. Matteo, due to the complexities and magnitude of government, delegation and redelegation of authority as to many functions is most

---

6. Under the definitional section of Title 5 [Section 4101], the pertinent language reads:

  (6) 'non-Government facility' means—

  (C) a medical, scientific, technical, educational, research, or professional institution, foundation, or organization;

  (D) a business, commercial or industrial firm, corporation, partnership, proprietorship, or other organization;

  (F) the services and property of any of the foregoing furnishing the training.

7. Neither party furnished the Court with a copy of any such prepared written statement. The Court does take notice of the fact that in defendant's deposition mention was made of the existence of a "position description." However, defendant at that time stated that it was out of date and that a new "position description" was in the process of being written. She further noted for the record that she didn't have a copy of the outdated "position description" with her.

8. 360 U.S. at 572–573, 79 S.Ct. at 1340.

necessary if government is to function effectively. 360 U.S. at 573, 79 S.Ct. at 1340.

The facts in this case uncontrovertibly demonstrate that defendant McKay was the individual solely responsible for determining the ability of the non-Government training facility, Employment Development Services, through its Quickhand course to "meet the training needs of the agency effectively, economically, and in timely fashion." *See* 5 C.F.R. § 410.502(a).

If the Acting Director of the Office of Personnel Management or even the Assistant Director of the Training Education Branch would be deemed immune from suit under the doctrine, as was conceded by plaintiff in oral argument, then it is necessary to conclude, under the authority of Heine v. Raus, *supra*, that defendant McKay, under the facts of this case, would be equally immune from suit.

The Court is aware that the Fourth Circuit in Heine v. Raus, *supra*, conditioned extending immunity to defendant therein on a finding that Raus had been issued instructions with the approval of the Director or of a subordinate authorized by the Director, in the subordinate's discretion, to issue such directions or instructions, or that the instructions were subsequently ratified and approved by such official.

As has been noted previously,[9] the Court does not have the benefit of any authorized, official "position description" from which to determine whether defendant's actions were expressly or impliedly approved and directed by her superiors. Nevertheless, the Court was supplied with affidavits of Ms. McKay's supervisors filed in support of defendant's motion.

W. Elbert Wilson, the then Acting Chief of the Training Education Branch and defendant's immediate supervisor, stated in his affidavit that it was defendant McKay's "responsibility to evaluate [a course's] relative merits to determine whether it [would] best fulfill NIH training needs as well as accommodate student preferences." In order to make such an evaluation, according to Mr. Wilson, it was her responsibility to seek a critique of the prospective course's relative quality and success. Furthermore, so that "a complete and objective opinion of the particular method of instruction" might be obtained, "these critiques are reciprocally shared during subsequent conversations with those training professionals who have been listed as references, or, with those independently contacted, who have had actual experience with the course under consideration."

Proceeding up the hierarchical ladder, the Court takes cognizance of the statements made by Robert S. Philleo, Assistant Director for the Training Education Branch, in his affidavit. Mr. Philleo stated that he was responsible for overseeing all aspects of training and education development operations within the Training Education Branch.

With respect to defendant's duties, the affiant stated:

. . . Jenean E. McKay [at the time of the alleged tort] was responsible for *developing, coordinating and evaluating* clerical training courses for the Office Skills Program as an Employee Development Specialist in the Training Education Branch . . . pursuant to the Government Employees Training Act. In fulfilling this duty, it is her responsibility to become familiar with the quality of the faculty and the instruction techniques of non-government and interagency clerical training courses and to discuss the courses with other government training professionals in order for her objectively and knowledgeably to determine whether a particular training course would meet NIH training needs and the quality criteria of the Office Skills Program. (Emphasis added)

9. *See* footnote 7, *supra.*

Finally, the Court has considered the affidavit of John M. Sangster, the then Director of the Office of Personnel Management at NIH and the individual responsible for overseeing all aspects of personnel management operations.

After noting that defendant was responsible for *developing, planning, coordinating and evaluating* clerical training courses, Mr. Sangster stated:

> In fulfilling these duties, it is her responsibility to become familiar with new training techniques and to discuss these techniques with other Government training professionals in order to enable her to make fair and accurate determinations as to whether these techniques would successfully meet NIH training needs and the Office Skills Program's quality criteria.

From these statements made under oath in the form of an affidavit, it is abundantly clear to the Court that there was in fact an authorized delegation of authority to defendant. Furthermore, the certain inference to be drawn from these statements is that defendant McKay had been instructed, either by Sangster himself, or by a subordinate official, authorized by Sangster, in the subordinate's discretion, to issue such instructions or directions to contact references supplied in order to make an evaluation of Quickhand, and at the same time to share these evaluative findings with other government training professionals. While it is not apparent to the Court how such an inference could be denied or controverted, the Court is most certainly of the opinion that if defendant McKay's actions were not authorized prior to their performance, they certainly were subsequently ratified and approved by the proper officials.

Therefore, pursuant to the mandate of the Supreme Court in Doe v. McMillan, *supra,* to conduct a "discerning inquiry into whether the contributions of immunity to effective government . . . outweighs the perhaps recurring harm to individual citizens," it is the Court's conclusion that the threshold question of whether or not the privilege extends to one in defendant's position must be resolved in favor of defendant McKay. Whether one attaches to her particular status convenient tags such as "suitable rank," "executive," "official" or "authorized agent," is not in the Court's estimation determinative.

Defendant McKay's activities are viewed by the Court as emanating from either a discharge of mandatory duties or premised on the sound exercise of discretionary authority. As to the latter, Judge Medina's opinion in Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655, 659, (2d Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L. Ed.2d 1050, explains the significance of "discretionary function."

> There is no litmus paper test to distinguish acts of discretion * * *, and to require a finding of 'discretion' would merely postpone, for one step in the process of reasoning, the determination of the real question—is the act complained of the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability?

With this characterization as a reference, defendant McKay's activities may be viewed as discretionary. She is required to make a decision as to whether or not she should recommend to her superiors a particular course. She alone is vested with this duty, and it is upon her recommendation that the Office of Personnel Management acts when it accepts or rejects an offer of training services. The recommendation itself is contingent upon the information she obtains as the result of conversing with other government training specialists. The reciprocal sharing of this information is inextricably interwoven in the entire process.

While defendant's duties or activities may readily be viewed as discretionary, the type of inquiry and interchange she

engaged in while evaluating the Quickhand course could with even more justification be viewed as a mandatory activity. As has been clearly demonstrated, her duties emanate from express congressional and administrative mandates. Whether one views her performance of these duties as being required of her by law by virtue of the process of delegation and redelegation, or the result of instructions or directions by her superiors, or even acts subsequently ratified by those superiors, is not controlling. What she did may come under some or all of these heads. The extension of the privilege to defendant in this case is not dependent upon rigid formulae.

■ What is important is that the policies from which such terms and concepts derive be served. If the congressional policy of procuring qualified, superior training courses for government employees is to be carried out, then the Courts must make certain that those persons on whom is laid the burden of assuring such results be allowed to perform their duties free from concern as to "damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." Barr v. Matteo, 360 U.S. at 571, 79 S.Ct. at 1339.

Having resolved the initial or "threshold" question, the Court must next determine whether the defendant's acts were within the scope of her duties, or at least within the outer perimeter of defendant's line of duty. Barr v. Matteo, 360 U.S. at 575, 79 S.Ct. at 1341.

With regard to "scope of duties," the language of the Second Circuit in Gregoire v. Biddle, 177 F.2d at 581, offers much insight:

The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him * * *

Light is also cast on the meaning of the phrase in the case of Doe v. McMillan, 93 S.Ct. at 2028, in which the Court succinctly noted the pertinent language of prior decisions.

[T]he Court determined in *Barr* that the scope of immunity from defamation suits should be determined by the relation of the publication complained of to the duties entrusted to the officer. Barr v. Matteo, *supra,* at 573–574 of 360 U.S., at 1340–1341 of 73 S.Ct.; see also the companion case, Howard v. Lyons, 360 U.S. 593, 597–598, 79 S.Ct. 1331, 1333–1334, 3 L.Ed. 2d 1454 (1959). The scope of immunity has always been tied to the "scope of authority." Wheeldin v. Wheeler, 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963).

■ Viewed in this context, defendant's actions were well within the "outer perimeters" of her duties. The previously quoted affidavits filed in support of defendant's motion more than adequately demonstrate that in fulfilling her duties of developing, coordinating and evaluating clerical courses, it was defendant McKay's *responsibility* to familiarize herself with the courses and "to discuss the courses with other government training professionals" in order to formulate her opinion as to whether or

not she should recommend a particular course to her superiors.

The Acting Chief of her branch, W. Elbert Wilson, even went so far as to say in his affidavit that if defendant had not discussed and evaluated the Quickhand course with other government training professionals, he would consider that "she would have been derelict in the performance of her duties as an Employee Development Specialist."

Both Mr. Philleo and Mr. Sangster stated, in almost identical language, that it is a recognized and common practice to share and evaluate training information among government training professionals particularly with regard to new training techniques and programs.

Finally the Court notes the fact that 5 U.S.C. § 4118(a)(6) calls for the formulation of regulations to cover "the interchange of training information among the agencies."

Apparently pursuant to this directive, 5 C.F.R. § 410.902 was promulgated and states as follows:

> An agency, *at the time and in the manner it considers appropriate,* or at the request of the Commission, shall *inform the Commission* and, as appropriate, *other agencies,* and State and Local governments of new, different, or particularly successful training practices or materials which it develops or *acquires* and *which it is able to share with others.* (Emphasis added)

Such interchange of information is a vital element in the planning, coordinating and evaluation of government training courses. Plaintiff's counsel in oral argument deplored any attempt by defendant to exalt what he termed "gossip mongering" with the euphemistic characterization of "information" or "evaluation exchange." Despite plaintiff's protestations to this effect, the Court feels it is duty bound to recognize the direct nexus between the acts complained of and the duties with which defendant was entrusted.

█ Whatever motive defendant McKay might have had when she dis-

cussed Quickhand with the other government employees is totally irrelevant to this proceeding. As stated in Spalding v. Vilas, 161 U.S. at 499, 16 S.Ct. at 637:

> . . . if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals.

and as further noted by the *Barr* Court in citing with approval the language of Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951):

> The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. 360 U.S. at 575, 79 S.Ct. at 1341.

█ Furthermore, even accepting plaintiff's narration as to what Ms. Stannard told plaintiff defendant had stated concerning falsification of Civil Service records and revocation of proficiency certificates, as the Court must do in such a motion, the result is not altered for whether defendant McKay made such statements or not is irrelevant to the Court's determination. If indeed defendant did make false statements and as a consequence thereof plaintiff was injured, this only goes to the merits of plaintiff's action for defamation and not to the question of whether the privilege should or should not attach.

As stated in Barr v. Matteo, 360 U.S. at 576, 79 S.Ct. at 1342:

> We are told that we should forbear from sanctioning any such rule of absolute privilege lest it open the door to wholesale oppression and abuses on the part of unscrupulous government officials. * * * To be sure, as with any rule of law which attempts to reconcile fundamentally antagonis-

tic social policies, there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good.

In light of the facts surrounding the commission of the alleged tort, the statements made in the various affidavits and deposition filed herein, and the legislative and administrative directive mentioned previously, the Court concludes that defendant was clearly acting within the outer perimeter of her duties.

Having determined that the privilege extends to defendant and attaches to immunize her conduct which was well within the scope of her duties, the Court by an order attached to this memorandum will grant defendant's motion for summary judgment.