## BAKER v COUCHMAN

Docket No. 264914. Submitted March 8, 2006, at Lansing. Decided May
30, 2006, at 9:00 a.m. Leave pending, 477 Mich ___.

Jason Baker brought an action in the Livingston Circuit Court
against Michael Couchman and Pinckney Community Schools.
Couchman is the superintendent of the school district, and the
plaintiff is a Livingston County sheriff's deputy. The plaintiff
included in his complaint an allegation that Couchman tortiously
interfered with a business relationship through his role in the
plaintiff's reassignment from being the school resource officer
(SRO) for Pinckney Community Schools to road patrol. The court,
David J. Reader, J., denied Couchman's motion for summary
disposition on the tortious interference claim, concluding that
Couchman was not entitled to governmental immunity. Couchman
appealed.

The Court of Appeals *held*:

The trial court properly denied summary disposition on the
claim. The superintendent of a school district is the highest
appointive executive official of that level of government and is thus
entitled to governmental immunity from tort under MCL
691.1407(5) as long as the acts that purportedly amounted to
tortious interference with a business relationship fell within the
scope of his executive authority. The determination whether
particular acts are within an executive's authority depends on a
number of factors, including the nature of the acts; the position
the official holds; the charter, ordinances, or other local law
defining the official authority; and the structure and allocation of
powers within the particular level of government. As superinten-
dent, Couchman has broad authority over the day-to-day opera-
tions of the school district, which necessarily involves supervising
faculty, staff, and other persons operating within the school
district and monitoring their interactions with students. It was
thus within the scope of Couchman's executive authority to closely
supervise the plaintiff's activities as SRO. It was within the scope
of Couchman's authority to express his concerns about the plain-
tiff's performance of his SRO duties to the plaintiff's superiors at
the sheriff's department, to the school board, and to the public in

general and even to petition those groups for the plaintiff's removal as SRO. It was also within Couchman's authority to create appropriate boundaries on the nature and extent of the plaintiff's proactive law enforcement activities as SRO. While it is within the scope of Couchman's authority to oversee the discipline and safety of students in his school district, the administration conceded some of that authority to law enforcement personnel by creating the partnership with them. It was not within the scope of Couchman's authority to actively interfere with the plaintiff's criminal investigations. It was decidedly outside the scope of Couchman's executive authority to prevent the plaintiff from contacting witnesses, to direct witnesses not to cooperate with a police investigation, to interfere with the collection of evidence, to withhold evidence, to actively facilitate the filing of third-party complaints against the plaintiff by chauffeuring an accused student's parents to the sheriff's department, and to attempt to influence a law enforcement officer to refrain from investigating or reporting possible criminal behavior. Because a jury could conclude that these acts were either wrongful per se or, if lawful, done with malice and unjustified in the law for the purpose of invading the plaintiff's contractual rights or a business relationship and could conclude that these acts were the ultimate cause of the plaintiff's transfer, Couchman was not entitled by reason of governmental immunity to summary disposition on the tortious interference claim.

Affirmed.

WHITBECK, C.J., concurred in the lead opinion, but wrote separately to respond to various statements made and issues raised in Judge O'CONNELL's opinion, noting that the focus of the lead opinion is not the plaintiff's conduct, but the conduct of the superintendent in this case, a case in which no trial has yet taken place.

O'CONNELL, J., concurring in part and dissenting in part, agreed that it was within the scope of Couchman's authority to express his concerns to the plaintiff's superiors, to the school, and to the public and to petition for the plaintiff's removal as SRO and that Couchman could set appropriate boundaries on the plaintiff's law enforcement activities as SRO. This authority, however, should provide a superintendent with absolute immunity for every allegedly wrongful action supporting the plaintiff's tortious interference claim. The challenged conduct involved acts taken by Couchman, in his role as chief administrator and disciplinarian, to protect students from what he perceived as the plaintiff's overreaction and overly zealous handling of minor matters when the

plaintiff's investigation inappropriately intensified or when it involved areas under Couchman's direct authority. Until the plaintiff received a contrary direction regarding a criminal matter from the sheriff's office, the prosecutor's office, or a judge, the plaintiff's authority was subject to, and limited by, the superintendent. Even if Couchman's actions were arguably improper, the plain language of the statute suggests an expansive application of the scope of executive authority. The trial court incorrectly ruled that the plaintiff had a legal recourse against Couchman.

GOVERNMENTAL IMMUNITY — SCHOOL SUPERINTENDENTS — INTERFERENCE WITH CRIMINAL INVESTIGATIONS.

The superintendent of a school district, as the highest appointive executive official of that level of government, is entitled to immunity from tort liability as long as the superintendent's allegedly tortious acts fall within the scope of his or her executive authority; a superintendent's broad authority over the day-to-day operations of the school district necessarily involves supervising faculty, staff, and other persons operating within the school district, including a law enforcement liaison officer, and monitoring the interactions of those persons with students; it is within the scope of a superintendent's authority to create appropriate boundaries on the nature and extent of a law enforcement liaison officer's proactive law enforcement activities at a school, but it is not within the scope of a superintendent's authority to actively direct or interfere with the officer's criminal investigations.

*Fett & Fields, P.C.* (by *James K. Fett*), for Jason Baker.

*Cox, Hodgman & Giarmarco, P.C.* (by *Timothy J. Mullins*), for Michael Couchman.

Before: SMOLENSKI, P.J., WHITBECK, C.J., and O'CONNELL, J.

SMOLENSKI, P.J. Defendant Michael Couchman appeals as of right from the trial court order denying his motion for summary disposition of plaintiff's tortious

interference with a business relationship claim under MCR 2.116(C)(7).[1] We affirm.

### I. FACTS AND PROCEDURAL HISTORY

Plaintiff Jason Baker has been a deputy with the Livingston County Sheriff's Department (LCSD) since June 1997. In November 2001, plaintiff was assigned to be the school resource officer (SRO) for Pinckney Community Schools. Initially, plaintiff claims to have had a good working relationship with school officials, including defendant, who is the superintendent. However, beginning in the summer of 2002, plaintiff claims that his relationship with defendant deteriorated. As a result of the breakdown in the working relationship between defendant and plaintiff, in April 2004, plaintiff was reassigned from his position as SRO for Pinckney Community Schools to road patrol.

In July 2004, plaintiff commenced the present lawsuit. In his first count, plaintiff alleged that defendant and Pinckney Community Schools violated the Whistleblowers' Protection Act (WPA)[2] by causing him to be reassigned to road patrol in retaliation for engaging in protected activities. In his second count, plaintiff alleged that defendant "intentionally, maliciously and improperly interfered with and disrupted" his employment relationship with the LCSD by interfering with his investigations, threatening him with removal, and improperly influencing LCSD to remove him from the position of SRO.

On July 22, 2005, defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10). At a

---

[1] Defendant Pinckney Community Schools is not a party to this appeal. We shall use "defendant" to refer solely to defendant Michael Couchman.

[2] See MCL 15.361 et seq.

hearing held on August 18, 2005, the trial court determined that defendants did not employ plaintiff and, hence, were not subject to liability under the WPA.[3] However, the trial court determined that defendant was not entitled to governmental immunity from plaintiff's claim for tortious interference with a business relationship. For these reasons, on the same day as the hearing, the trial court entered an order granting defendants' motion with respect to plaintiff's WPA claim, but denying it with respect to plaintiff's claim of tortious interference with a business relationship.[4] Defendant then appealed as of right the trial court's determination that he was not entitled to governmental immunity. See MCR 7.202(6)(a)(v) and 7.203(A)(1).

### II. IMMUNITY

Defendant argues that he is entitled to absolute governmental immunity from suit under MCL 691.1407(5). Therefore, he further contends, the trial court should have dismissed under MCR 2.116(C)(7) plaintiff's claim of tortious interference with a business relationship. We disagree.

This Court reviews de novo the grant or denial of a motion for summary disposition to determine whether the moving party is entitled to judgment as a matter of law. *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25, 98; 709 NW2d 174 (2005). Likewise, the applicability of governmental immunity is a question of law reviewed de novo. *Herman v Detroit*, 261 Mich App 141, 143; 680 NW2d 71 (2004). Summary disposition under MCR 2.116(C)(7) is appropriate if the claim is barred by immunity granted

---

[3] See MCL 15.362.

[4] Plaintiff has not appealed the dismissal of his WPA claim.

by law. *Maiden v Rozwood*, 461 Mich 109, 118; 597
NW2d 817 (1999). "A party may support a motion under
MCR 2.116(C)(7) by affidavits, depositions, admissions,
or other documentary evidence." *Id.* at 119. Further-
more, the "contents of the complaint are accepted as
true unless contradicted by documentation submitted
by the movant." *Id.*

Pursuant to MCL 691.1407(5), "[a] judge, a legisla-
tor, and the elective or highest appointive executive
official of all levels of government are immune from tort
liability for injuries to persons or damages to property if
he or she is acting within the scope of his or her judicial,
legislative, or executive authority." There is no intent
exception to the immunity provided by MCL
691.1407(5). *American Transmissions, Inc v Attorney
General*, 454 Mich 135, 143-144; 560 NW2d 50 (1997).
Instead, the relevant inquiry is always whether the
official acted within the scope of his or her authority. *Id.*
at 144. The superintendent of a school district is the
highest appointive executive official of a level of govern-
ment. *Nalepa v Plymouth-Canton Community School
Dist*, 207 Mich App 580, 589; 525 NW2d 897 (1994),
result only aff'd 450 Mich 934 (1995).[5] Therefore,
defendant is entitled to immunity from tort liability as
long as the acts, which purportedly amount to tortious

_____

[5] We disagree with plaintiff's contention that *Giddings v Detroit*, 178
Mich App 749; 444 NW2d 242 (1989), and *Kirschner v Carney-Nadeau
Pub Schools*, 174 Mich App 642; 436 NW2d 416 (1989), are properly
applicable to this case. In *Nalepa*, the Court recognized that these cases
had held that superintendents were not entitled to absolute immunity.
*Nalepa, supra* at 589-590. However, the Court in *Nalepa* determined that
those cases construed the law as it existed before the enactment of 1986
PA 175. For that reason, the Court in *Nalepa* declined to follow them.
Instead, it determined that under the plain meaning of MCL 691.1407(5),
superintendents were entitled to absolute immunity. *Nalepa, supra* at
590. Consequently, *Nalepa* is the relevant controlling authority.

interference with a business relationship, fell within the scope of defendant's executive authority. MCL 691.1407(5).

> "The determination whether particular acts are within their authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government." [*Amercian Transmissions*, *supra* at 141, quoting *Marrocco v Randlett*, 431 Mich 700, 711; 433 NW2d 68 (1988).]

In his complaint, plaintiff alleged that defendant engaged in a series of acts of misconduct with the intention to interfere with plaintiff's employment relationship with the LCSD. At his deposition, plaintiff indicated that his relationship with defendant began to deteriorate after he conducted an investigation that led him to conclude that the school district had a problem with employee theft. Plaintiff said that defendant told him that defendant was appalled at the accusation and attempted to direct plaintiff's attention toward a specific individual. Plaintiff eventually turned the investigation over to the detective bureau to avoid conflict with defendant and other school officials.

After this incident, plaintiff stated that school officials became very uncooperative, and defendant began to directly interfere with his attempts to investigate potential crimes. Plaintiff testified at his deposition concerning three particular incidents. In the first incident, plaintiff was investigating a complaint by a student that another student stole clothing from his locker. Plaintiff stated that, while he was investigating the complaint, defendant told him to cease investigating the alleged theft and told him not to have contact with the student identified by the victim as the perpetrator.

In another incident, plaintiff was investigating an alleged threat involving a knife. Plaintiff stated that the parents of the student who allegedly made the threat contacted defendant, who then demanded a meeting with plaintiff. At the meeting, plaintiff claims that defendant tried to convince plaintiff to cease investigating the crime because the student was part of a good family that had been very supportive of the school district. Plaintiff further stated that he was concerned when he received the knife purportedly used in the altercation through defendant's office. Plaintiff said that he should have been permitted to get the knife directly from the student in order to preserve the chain of custody.

The incident that led to the complete breakdown in the relationship between plaintiff and defendant began, according to plaintiff, with plaintiff's investigation of a reckless driving incident that resulted in damage to a student's car. Plaintiff stated that he investigated the incident and then told the parents of the student who caused the damage that they should work out a solution with the victim's parents or he might have to turn the matter over to the prosecutor's office. After this discussion, plaintiff said he attempted to collect the student's vehicle registration and insurance papers, but the student told him that his parents were meeting with defendant and that plaintiff would get the papers later. Plaintiff stated that defendant apparently drove the parents to the sheriff's department to file a complaint against plaintiff for threatening their son, but the complaint was found to be without merit. Plaintiff further claimed that, when he again tried to obtain the papers for the student's vehicle, the student informed him that the assistant principal had them. Plaintiff said he then attempted to get the papers from the assistant principal, but she refused to hand them over. She told

plaintiff that defendant had instructed her not to give the papers to him and had also instructed her to tell plaintiff that he was not to have further contact with the student. Plaintiff proceeded to turn the matter over to his superior officer, who was also denied access to the papers, purportedly at the behest of defendant. Thereafter, plaintiff's superiors issued a warrant request against defendant for obstruction of justice and witness tampering, which request was later withdrawn. After the final incident, the prosecutor's office suggested mediation, which was unsuccessful. Thereafter, plaintiff was removed from the SRO position.

In addition to these incidents of interference, plaintiff alleges that defendant engaged in a concerted effort to remove him from his position as SRO. Plaintiff claims that defendant circulated a pamphlet to the school board denouncing plaintiff, solicited the aid of parents to petition for plaintiff's removal and file complaints against him, and directly contacted his superiors at LCSD in an attempt to obtain plaintiff's removal as SRO.

After careful consideration of the alleged misconduct, we conclude that some, but not all, of the described conduct falls within the scope of defendant's executive authority. As the highest executive authority of the school district, defendant clearly has broad authority over the day-to-day operations of the school district, which necessarily involves supervising faculty, staff, and other persons operating within the school district and monitoring their interactions with the students. Hence, we hold that it was within the scope of defendant's executive authority to closely supervise plaintiff's activities as SRO. It was also within the scope of defendant's authority to express his concerns to plaintiff's superiors, to the school board, and to the public in

general and even to petition these groups for plaintiff's removal as SRO. Additionally, it was within the scope of defendant's authority to create appropriate boundaries on the nature and extent of plaintiff's proactive law enforcement activities while acting as SRO.

However, we cannot conclude that it was within the scope of defendant's authority to actively interfere with plaintiff's criminal investigations. Indeed, it was decidedly *outside* the scope of his executive authority as superintendent of a school district to prevent plaintiff, a county law enforcement officer, from contacting witnesses, to direct witnesses not to cooperate with a police investigation, to interfere with the collection of evidence, to arguably withhold evidence, to actively facilitate the filing of third-party complaints against plaintiff (that is, by chauffeuring a student's parents to the sheriff's department), and to attempt to influence a law enforcement officer to refrain from investigating or reporting possible criminal behavior.[6] We acknowledge that it is within the scope of defendant's authority to oversee the discipline and safety of students in his district; however, we find it significant that in exercising that authority, defendant agreed to a partnership with the LCSD to allow law enforcement personnel onto school grounds with the express duty of "[i]nvestigat-[ing] criminal complaints on school property." While investigation of misconduct on school grounds is foremost within the province of the school administration, once the administration opens the schoolhouse doors to assistance from law enforcement personnel, it concedes some of its authority to that autonomous agency. That

---

[6] We similarly reject defendant's contention that the prosecutor's failure to charge defendant with a crime indicates that these acts were lawful. Prosecutors may decline to pursue criminal charges for a variety of reasons, and we decline to speculate concerning the meaning behind the fact that no charges were pursued in this matter.

is, while the administration would be expected to remain involved to the extent it was necessary to advocate for its students' best interests, the administration loses its authority to direct or interfere with law enforcement personnel's function of investigating conduct violative of the laws of this state. We reiterate and stress that, to the extent defendant was dissatisfied with or critical of plaintiff's investigative methods, it would be within the province of defendant's authority to express those concerns to the appropriate parties. But, notably, we see no indication in the record that plaintiff was engaged in any misconduct in his pursuit to investigate criminal activity. Hence, MCL 691.1407(5) does not immunize defendant from tort liability for injuries arising from these acts of interference.

We also reject defendant's contention that, even if he is not entitled to absolute immunity under MCL 691.1407(5), he is entitled to qualified immunity under MCL 691.1407(2). Under MCL 691.1407(2), "each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability" if each of three conditions is met. One of the three conditions is that the "officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority." MCL 691.1407(2)(a). As already noted, defendant's actions interfering with a criminal investigation clearly fell outside the scope of his authority. Further, we hold that no person in defendant's position would reasonably believe that such conduct was within the scope of his or her authority. Therefore, defendant would not be entitled to immunity under MCL 691.1407(2).

### III. CONCLUSION

Although defendant is entitled to governmental immunity to the extent that plaintiff's claim is premised on conduct we have determined to be within the scope of defendant's executive authority, to the extent that plaintiff's claim is based on defendant's interference with plaintiff's criminal investigations, it is not barred by governmental immunity. Because a jury could conclude that these acts were either wrongful per se or,[7] if lawful, done with malice and unjustified in the law for the purpose of invading plaintiff's contractual rights or a business relationship, see *Badiee v Brighton Area Schools*, 265 Mich App 343, 367; 695 NW2d 521 (2005), and could conclude that these acts were the ultimate cause of plaintiff's transfer, defendant was not entitled to summary disposition of plaintiff's tortious interference claim on the basis of governmental immunity.

### IV. RESPONSE TO THE DISSENT

Because we believe our esteemed colleague has misconstrued the record evidence and misunderstood the limited nature of our holding, we feel compelled to respond to some of the issues addressed in the dissent.

First, we note that we are somewhat troubled by our dissenting colleague's characterization of the record evidence. We must clarify that this case is not about the authority of a superintendent to control the actions of a security guard hired by the school district. Defendant is a full-fledged deputy of the Livingston County Sheriff's Department. In addition, although a jury might decide that plaintiff was transferred because he was "overzeal-

---

[7] "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall v Community Nat'l Bank of Pontiac*, 166 Mich App 772, 780; 421 NW2d 289 (1988).

ous" and "overbearing," *post* at 193, 196, the evidence
also supports the conclusion that plaintiff was a respon-
sible police officer who was simply the subject of abuse
at the hands of a superintendent who personally dis-
liked him.[8] In any event, the relevant inquiry is whether
defendant's conduct is entitled to governmental immu-
nity. Consequently, whether plaintiff was "overzealous"
or "overbearing" is irrelevant. Furthermore, although
the dissent characterizes the incidents at issue as
"trivial" and "minor," *post* at 194, 198, we sincerely
doubt that the student-victim who asked defendant for
assistance in recovering his stolen property or the
parents of the student who was threatened with a knife
would consider such incidents to be trivial or minor in
nature. Criminal activity on our public school campuses
must be taken just as seriously, if not more seriously,
than crimes committed off-campus.

Second, we believe the dissent has misstated the
extent of our holding. As noted above, we recognize that
superintendents have broad authority to supervise the
affairs of their school districts. This authority includes
the right to delineate appropriate boundaries for *proac-
tive* law enforcement on public school campuses. Hence,
it was within defendant's authority to tell plaintiff not
to conduct sting operations on campus or to enlist the
aid of students in conducting law enforcement activi-
ties. Likewise, it was clearly within defendant's author-
ity to contact plaintiff's supervisors and to petition for
plaintiff's removal as SRO. However, once a complain-

---

[8] We note that the dissent neglects to mention that for each of the
relevant incidents, plaintiff was asked to initiate an investigation either
by the victim or another authorized person. The dissent further neglects
to mention that the record contains evidence that plaintiff's superiors
actually instructed him to speak to the media about several incidents and
that when the superintendent asked plaintiff to refrain from further
media interviews, he complied.

ant has filed a complaint with a duly authorized police officer and that officer has begun a formal investigation, even when that officer is an SRO, the superintendent's ability to interfere with that investigation is necessarily limited. To hold otherwise is to invite school administrators to interfere with the criminal investigations of officers assigned to cases involving students or school personnel whenever the administrators feel that the investigation might reflect poorly on the school district. Such a holding would place police officers in the untenable position of having to decide between upholding the law and acquiescing to the whims of administrators who would rather avoid bad publicity.

We further disagree that our determination that it is not within the scope of a superintendent's executive authority to interfere with an active police investigation will interfere with the day-to-day operations of the school district. Because our holding is limited to interference with *active* police investigations, it will not affect a principal or superintendent's ability "to break up a fistfight or detect and punish the theft of a yo-yo." *Post* at 198. Nor will it compel school officials to resort to calling the police every time an incident occurs. Instead, our narrow holding preserves the right of a superintendent to make administrative decisions regarding the activities of an SRO within his or her school district without needlessly broadening the superintendent's authority to encompass decisions properly left to prosecutors and law enforcement personnel.

We believe that the dissent's proposed holding would create additional uncertainty and tension between school officials and the police officers assigned to investigate crimes involving students and school personnel. The dissent would grant superintendents the authority to interfere with an active criminal investigation by a

police officer assigned to the school district until the investigation is officially sanctioned by the sheriff, the prosecutor's office, or a judge. Hence, the dissent appears to recognize that it would be beyond the scope of a superintendent's executive authority to directly interfere with the activities of prosecutors, judges, and sheriffs. However, because we believe that even police officers who are assigned to a school district must be permitted to perform criminal investigations without fear of retaliation or interference by school officials, we must disagree with the dissent's analysis and conclusion.

We also disagree with the dissent's attempt to characterize plaintiff's employment situation as one involving dual employers.[9] As we noted, plaintiff is employed by the LCSD as a deputy. Furthermore, although we concluded that it was within the scope of defendant's authority as superintendent to supervise and place some limits on plaintiff's activities as SRO, at no point did we conclude that this authority was based on plaintiff's status as an employee of the school district. Indeed, we premised this authority on defendant's broad authority over the day-to-day operations of the school district, which necessarily involves supervising faculty, staff, and *other persons operating within the school district*.[10] See p 182 of this opinion. Hence, we concluded that the superintendent would have such

---

[9] We note that defendant does not contend that plaintiff was an employee of the school district. Indeed, in his brief on appeal, defendant actually argued that plaintiff did not have an "employment or business relationship with [the] School District."

[10] Had plaintiff truly been an employee of the school district, as the dissent claims, defendant could have terminated plaintiff's employment directly. Yet even defendant recognized that he could not effect plaintiff's transfer or termination without the consent of plaintiff's supervisors at the LCSD.

authority even over third parties not employed by the
school district, but nevertheless operating within the
school district. Needless to say, the authority to super-
vise third parties operating within the school district
does not transform these individuals into employees of
the school district.[11]

Finally, we must also respectfully disagree with the
dissent's conclusion that the conduct we have identified
as falling outside defendant's executive authority does
not amount to tortious interference with a business
relationship. Plaintiff's tort claim is premised on the
theory that defendant interfered with plaintiff's inves-
tigations in order to render his investigations ineffec-
tive and, thereby, influence plaintiff's superiors to re-
move plaintiff from his position as SRO. Viewing the
record evidence in the light most favorable to plaintiff,
as we must, *Smith v Globe Life Ins Co*, 460 Mich 446,
454; 597 NW2d 28 (1999), we conclude that there is a
factual question on that issue. The incidents described
above are evidence of the extreme lengths to which
defendant would resort in order to stifle any investiga-
tion involving plaintiff. A jury could infer from these
incidents that the sheriff's office was left with no choice
but to remove plaintiff from his position in order to
placate defendant and avoid the kind of escalation
evidenced by the sheriff's request for a warrant for
defendant's arrest. Therefore, while we might person-

---

[11] We sincerely doubt that the school district would embrace the
dissent's expansive view of employment. Under the dissent's view,
vendors, repairmen, contractors, college recruiters, and the innumerable
other individuals who routinely perform services within the school
district would be considered dual-employees simply because the superin-
tendent has the authority to place limits on their activities and supervise
their interactions with students. Such a holding would have far greater
ramifications for the school district than our rather limited holding that
it is outside the scope of a superintendent's authority to interfere with an
active police investigation.

ally come to a different conclusion, a reasonable jury could conclude that plaintiff properly performed his duties as SRO and would not have been transferred were it not for the fact that defendant's interference rendered plaintiff ineffective.[12]

Affirmed.

Whitbeck, C.J. (*concurring*). I concur in the lead opinion. I write separately first to respond to the dissent's rather remarkable statement that "[t]his case sets an abominable precedent because it blurs the previously unmistakable lines marking the boundaries of a superintendent's personal liability." *Post* at 206. The abominable precedent, in my view, would be that a school superintendent may prevent a sworn law enforcement officer from contacting witnesses, may direct witnesses not to cooperate with that officer, may interfere with the collection of evidence, may arguably withhold evidence, and may drive a suspect's parents to the sheriff's department to facilitate the filing of a complaint against the law enforcement officer investigating that suspect. If such conduct is within "previously unmistakable lines," then I wonder what is outside those lines.

Second, as the lead opinion makes abundantly clear, the issue here is not with the *law enforcement officer's* conduct, however characterized. Rather, the issue is with the *superintendent's* conduct. The dissent's

---

[12] We also disagree with the dissent's conclusion that plaintiff has not suffered a cognizable loss. Plaintiff presented evidence that his transfer to road patrol significantly decreased his earning potential with the LCSD. A reasonable jury could conclude that this loss of earning potential was the direct result of defendant's interference. Hence, there is a factual question about damages. Furthermore, the fact that the position from which he was transferred was created with the cooperation of the school district is irrelevant. Plaintiff had the right to pursue his assigned position without improper interference from third parties.

lengthy recitation of the law enforcement officer's alleged transgressions is therefore entirely irrelevant to the issue at hand.

Third, the dissent conjures up a number of hypothetical examples, unmoored to the facts of this case but apparently drawn from unpublished opinions of this Court. *Post* at 201-202 & n 8. It has always been my understanding that courts exist to decide the cases that actually come before them, not other cases, real or imagined. I know of nothing in our jurisprudence that designates us as judicial knights errant, empowered to wander about the legal landscape and tilt at every available windmill, unhampered by the lack of a factual record or legal argument. Apparently the dissent does not share that understanding and invites us to consider and devise hypothetical solutions for fact situations that are not actually before us. Declining the invitation to join in such an undertaking is, fortunately, an easy task.

Fourth, the dissent states that "[h]olding a superintendent civilly liable for money damages when he acts in the place of the student's parents to protect a student from unjustified acts sets an untenable precedent indeed." *Post* at 203 n 9. Here the dissent overlooks the inconvenient fact that there has as yet been no trial and the superintendent is therefore not being "held" civilly liable. If and when a jury or a judge finds in the law enforcement officer's favor, then, and only then, may the superintendent face civil liability.

Finally, I am at a loss to understand how concluding that there is a question of fact about whether the superintendent interfered with the law enforcement officer in order to make his investigations ineffective and thereby influence his superiors to remove him from his position somehow requires "superintendents to protect themselves by placing the concerns of others over the

interests of the children in their charge." *Post* at 206. I
note that the dissent fails to identify the "others" whose
concerns must now trump those of schoolchildren. Fur-
ther, the dissent does not specify how our decision "re-
quires" superintendents to do anything, much less place
the concerns of these unspecified "others" over the inter-
ests of schoolchildren. If lurking somewhere below the
dissent's rather labored rhetoric is the suggestion that
investigating potential or actual crimes at or near schools
is not in the interests of schoolchildren, then I can only
respond by stating that I can think of nothing that is more
in such children's interests.

O'CONNELL, J. (*concurring in part and dissenting in
part*). I concur with the lead opinion that it was within the
scope of a superintendent's authority "to express his
concerns to plaintiff's superiors, to the school board, and
to the public in general and even to petition these groups
for plaintiff's removal as" the school resource officer
(SRO). *Ante*, pp 182-183. Additionally, I concur that "it
was within the scope of defendant's authority [as super-
intendent] to create appropriate boundaries on the nature
and extent of plaintiff's proactive law enforcement activi-
ties while acting as SRO." *Ante*, p 183. However, I would
hold that this authority provides defendant with absolute
immunity for every allegedly "wrongful" action support-
ing plaintiff's claim for tortious interference with business
relations.[1] Therefore, I respectfully dissent.

---

[1] The lead opinion states that plaintiff's primary complaint is that
"defendant 'intentionally, maliciously and improperly interfered with
and disrupted' his employment relationship with the [Livingston County
Sheriff's Department (LCSD)] by interfering with his investigations,
threatening him with removal, and improperly influencing LCSD to
remove him from the position of SRO." *Ante*, p 177. Assuming, arguendo,
that defendant did exactly what plaintiff alleges, I would hold that (a)
defendant has done nothing improper and (b) defendant, pursuant to
MCL 691.1407(5), has absolute immunity for his actions.

The primary shortcoming of the lead opinion is its overly narrow interpretation of the term "scope of authority." By narrowly construing the term "scope of authority," the lead opinion exposes all public officials to civil liability for an inartful statement or an alleged wrongful decision. Any individual can now claim that a factual question exists about the public official's "scope of authority," thereby avoiding summary disposition and subjecting that public official to a lawsuit when, as in this case, one of the primary motivations of the lawsuit is personal animosity or bias toward the public official. While I neither approve nor disapprove of the superintendent's and the SRO's actions in this matter, rather than bring the business of the public official to a standstill while frivolous matters are litigated, the law should, and does, grant immunity to the public official for such matters.

Defendant receives "absolute" immunity if it was within his authority to protect his students from what he perceived[2] as an overzealous monitoring officer who routinely overexerted his dual authority[3] as school

---

[2] Whether his perception is correct or wrong, defendant is entitled to immunity if monitoring the SRO is within the scope of defendant's authority.

[3] The lead opinion concedes that the SRO has a dual employment role because the SRO works for and at the direction of the superintendent (while working for the school district, the defendant is plaintiff's supervisor) and simultaneously for and at the direction of the sheriff's department.

This concession, if true, renders plaintiff's lawsuit meritless. To prosecute a cause of action for intentional interference with a business relationship, the law requires the intervention of a third party. An employee's supervisor is not a third party to the employment relationship, but a representative agent of the employer, so a supervisor cannot be sued for intentional interference with the employee's business relationship. If this were the case, each time a dual employment supervisor fired an employee, the supervisor would be subject to a similarly meritless lawsuit. The majority's holding creates an untenable situation for all dual and contract employers by leaving supervisors open to suit for

official and police officer in minor matters ranging from stolen gym shorts to haphazard driving in the school parking lot. MCL 691.1407(5). In the superintendent's opinion, plaintiff's investigative fervor in fairly trivial matters criminalized the students and disrupted the school's order and operations, requiring defendant to exercise his own, concededly superior, administrative and disciplinary authority to truncate plaintiff's investigations and student interrogations. Unfortunately, neither plaintiff nor defendant learned discretion, and defendant's posture toward plaintiff became adversarial, leading defendant to call for plaintiff's removal. Nevertheless, plaintiff has failed to demonstrate any tortious incident that falls outside the scope of defendant's superior authority. Therefore, I am of the opinion that the trial court incorrectly ruled that plaintiff's disgruntlement with his employment situation provides him with legal recourse against defendant.

Because of the nature of the case, a full review of the record is warranted. The record reflects that plaintiff repeatedly pursued minor school incidents with vigor, often seeking to arrest, write citations, or launch lengthy investigations rather than defer to the school's administration for routine admonition and correction. For example, plaintiff's relationship with the school began to break down when plaintiff, who was investigating a theft that had occurred over the summer, launched an investigation into alleged fraud and em-

---

taking any disciplinary action that could "interfere" with an employee's "other" business relationship.

Imagine the everyday situation in which a Manpower employee, working for General Motors Corporation (GM), is dismissed from service by his GM supervisor. The majority's holding would allow the employee to sue the supervisor for intentional interference with the employee's business relationship with Manpower. Our courts have never extended this tort so far beyond its original, legitimate purpose.

bezzlement by school staff and demanded to see various school records. Defendant balked at bringing his administration to a standstill to pacify plaintiff's investigative curiosity, and the prosecutor's office eventually directed plaintiff to turn the matter over to a disinterested detective at the sheriff's office. Nothing apparently came of the matter except, of course, an incalculable loss of respect for plaintiff's judgment among the school's staff and defendant.

Soon afterward, plaintiff participated in an investigation of a sexual assault involving some of the school's students. Later, plaintiff also directed undercover investigations into drug activity. These problems garnered negative press coverage for the school, but plaintiff readily provided the media with commentary. Defendant did not interfere with these investigations, but he vocalized displeasure that plaintiff apparently relished his role as commentator and intentionally fed the media frenzy. He also voiced his ire at plaintiff's indiscretion to plaintiff's superiors. The following summer, members of the sheriff's department and school administrators met regarding plaintiff's future at the school. Defendant told the department that he thought the relationship was irreconcilable.

Plaintiff returned the following school year, but defendant intervened in some of his investigations and entirely preempted others. One might presume this intervention to be improper until one learns that the investigations involved matters like stolen gym shorts and physical altercations or threats (which plaintiff categorized as "assaults") between students. Moreover, the intervention initially amounted to nothing more than defendant discouraging plaintiff from pursuing the matter, as in the "assault" cases, or defendant telling plaintiff to stop his investigation, as in the

matter of the gym shorts.[4] In each of these cases, plaintiff provided his LCSD supervisor with reports of defendant's behavior, but the sheriff's department never tried to supersede defendant's authority. At this point, the evidence demonstrates that defendant did not interfere at all with plaintiff's most serious and damaging investigations, but instead took reasonable preemptive measures only when an investigation inappropriately intensified or veered into areas under defendant's direct authority.

Plaintiff again overreacted to an incident of careless driving in the school parking lot, however, and the parents of the accused student driver understandably recoiled at plaintiff's typical zeal and overbearing demeanor. For example, plaintiff threatened their son with charges of reckless driving and malicious destruction of property and warned the parents that if they did not work something out with the victim's parents, he would turn the case over to the local prosecutor's office. The parents met with defendant, who personally drove them to the sheriff's office to complain about plaintiff's investigative practices. In the meantime, plaintiff had tracked down the young driver and pressed him to produce his driver's license, registration, and proof of insurance. The student explained that they had been provided to an assistant principal. Discontented with

---

[4] Plaintiff argues that defendant primarily interfered with his investigations by ordering him to discontinue them or forbidding him from talking to various students. This argument self-destructs. Either defendant had the authority to call off plaintiff's investigations (and, implicitly, the authority to limit them), or plaintiff yielded to defendant's requests even though defendant could not force him to stop investigating. The first option means that all of plaintiff's investigations fell within defendant's scope of authority, and that defendant is absolutely immune. The second option means that plaintiff generally acquiesced to defendant's requests, and that he cannot now claim that they improperly interfered with his job.

that avenue of administration and resolution, plaintiff went to the assistant principal and demanded the documents. The assistant principal informed plaintiff that defendant had the documentation forwarded directly to the parents of the other student involved in the incident. The assistant principal further explained that defendant had directed her to withhold the documents from plaintiff and instruct plaintiff not to question the student further. Plaintiff again complained to his supervisor that defendant was obstructing his investigations, and the supervisor again removed plaintiff from the case. Plaintiff was reassigned to road patrol a few months later.

Even though defendant admittedly interfered with plaintiff's authority, plaintiff still fails to demonstrate how the interference fell outside the scope of *defendant's* authority. A superintendent's role includes any act taken as chief administrator and disciplinarian in the school district, even in school districts that decide to engage monitoring police officers for additional manpower, surveillance, and protection. Superintendents are the highest-level executives of school districts, so they are entitled to absolute immunity for actions they take pursuant to that authority. *Nalepa v Plymouth-Canton Community School Dist*, 207 Mich App 580, 590-591; 525 NW2d 897 (1994), result only aff'd 450 Mich 934 (1995); MCL 691.1407(5). The absolute immunity extended to highest-level executives does not contain an intentional-tort or "malevolent-heart" exception, and the executive's motivation for acting is irrelevant to the analysis. *American Transmissions, Inc v Attorney General*, 454 Mich 135, 143; 560 NW2d 50 (1997). Instead, whether an action falls within an executive's scope of authority depends on factors such as " 'the nature of the specific acts alleged, the position held by the official alleged to have performed the acts,

the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government.' " *Id.* at 141, quoting *Marrocco v Randlett*, 431 Mich 700, 711; 433 NW2d 68 (1988).

Overseeing the handling of minor criminal incidents or civil unrest on school grounds is always within the scope of a superintendent's authority. Otherwise, a principal or superintendent lacks the authority to break up a fistfight or detect and punish the theft of a yo-yo. The school would always resort to calling in the police to preserve the crime scene, conduct an investigation, and cart away the culprits. The structure and allocation of powers in the school placed defendant as the primary authority in managing these school affairs. As plaintiff's superior in this regard, defendant was acting within his authority to stop plaintiff's investigation into the automobile incident and the missing shorts, just as plaintiff was within his authority to resort to his supervisor for further instruction. Until plaintiff received a contrary direction regarding a criminal matter from the sheriff's office, the prosecutor's office, or a judge, his authority to act was subject to, and limited by, defendant.

Although the last incident undoubtedly interfered with plaintiff's investigation, the majority concedes that "it was within the scope of defendant's authority to create appropriate boundaries on the nature and extent of plaintiff's proactive law enforcement activities . . . ." *Ante,* p 183. It stands to reason that withholding the documentation from plaintiff was within the scope of defendant's discretionary authority to set those boundaries. Every other time defendant instructed plaintiff to stop an investigation or refrain from interrogating a student, plaintiff complied. Because defendant permis-

sibly terminated plaintiff's investigation into a school matter, turning the documents over to him would be unnecessary and counterproductive.

Rather than rely entirely on defendant's control of plaintiff's investigation, the lead opinion turns to defendant's decision to drive the unhappy parents to the sheriff's department to lodge their complaints directly with plaintiff's supervisors. As an initial matter, this action, in context, was an effort to control the school's personnel and institute correct remedial procedures for the angry parents. Therefore, I would find that this act falls within defendant's executive authority. Assuming, arguendo, that driving angry parents to a sheriff's station to register a complaint falls outside the scope of a superintendent's authority, there was nothing tortious about it.

To sustain a claim for tortious interference with contract or business relations, a plaintiff must demonstrate a wrongful act, which means that the act must be wrongful per se or otherwise malicious and unjustified. See *BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996). If the interference results from legitimate business reasons or stems from a privileged attempt to persuade others of the interferer's position in a dispute, then no cause of action for tortious interference will lie. *Id.*; *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 401-404; 538 NW2d 24 (1995). Moreover, the interferer in the business relationship must be a stranger to the established relationship. *Reed v Michigan Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993).[5] In this

---

[5] I note that defendant is not only closer to the business relationship than a "stranger," he acted as plaintiff's supervisor while plaintiff was a member of the school district's staff.

case, removing undesirable personnel was part of defendant's job, so the desire to remove plaintiff from the district was a legitimate justification for his actions, not a malicious design that rendered his acts wrongful. Furthermore, plaintiff is essentially complaining that defendant interfered with his business relationship with the school district, not his relationship with the sheriff's department. Plaintiff has not demonstrated any adverse effect defendant's actions had on his standing in the department;[6] instead, all his claims relate to the benefits he no longer enjoys because of his failed relationship with the district. Under the circumstances, defendant acted on the district's behalf to terminate its relationship with plaintiff, and in cases of such a direct relationship, we should leave the parties to negotiate their own contract remedies rather than assign them rights and responsibilities through tort.[7] See *id.*

Addressing the concurrence, if I have belabored my rhetoric, it reflects my frustration with what should be a simple case. I have presented the issue from every

---

[6] Plaintiff has not asserted that he lost any wages or ordinary employment benefits related to his job as a deputy sheriff for Livingston County. Plaintiff is apparently still employed with the LCSD and performs investigative and policing functions similar to those he performed before the department reassigned him. Nevertheless, plaintiff complains that defendant, his superior, interfered with his "right" to work in one of defendant's schools by acting on his dissatisfaction with plaintiff's job performance. I am surprised that this allegation's obvious paradox is not self-evident.

[7] This case is akin to a situation I recently addressed in *Neill v Delphi Automotive Systems Corp*, unpublished opinion per curiam of the Court of Appeals, issued January 27, 2004 (Docket No. 243834), in which the panel unanimously held that terminated contract employees may not sue their de facto employers in tort for interfering with their business relationships with the contract employer. Because the supervising employers must retain some authority to terminate the assigned workers, the employers are too involved to be considered third parties to the business relationship. *Id.*

viewpoint imaginable, and used expressive language only because I find the correct answer obvious and the contrary result and precedent alarming. If Chief Judge WHITBECK thinks that I have overstated the issue, perhaps he should consider the following hypothetical "others" that would now have a cognizable claim under the majority's holding.

In a controversy over union fees, a teacher openly and carelessly airs his dispute with the media and his students. Should the superintendent stand mum or candidly respond to the media's questions with an equally slanted perspective? Should the superintendent voice disagreement at a school board meeting and order the teacher to stop venting to his students and the press? Should he consider his potential individual liability for possibly interfering with the teacher's business relations?

An individual appears, without invitation, at a superintendent's private personnel meeting and will not leave. Should the superintendent avoid personal liability by allowing the individual to stay and influence the meeting, or remove the individual with force if necessary? What if the individual is a school board member?

A superintendent takes a controversial opposing view on the assignment of a proposed physical education teacher about whom the superintendent has received disparaging correspondence from an acknowledged authority. The teacher seeks to arbitrate her denial of the assignment and wins. A successive appeal is initiated and then dropped, and the uninformed public begins grumbling about the expense and futility of the school's seemingly baseless stubbornness. Should the superintendent stand mute and face the unjustified wrath of a confused public, or should she read the information received into the record at a school board meeting and

face personal liability dependent only on whether mak-
ing slanderous statements and invading someone's pri-
vacy falls within the scope of her authority?

A superintendent discovers a spiritually uplifting
movie that contains a particularly shocking scene in
which a young amputee fails in a suicide attempt, only
to find later that he has value beyond his physical form.
The superintendent personally oversees the distribu-
tion of the movie to his district's second graders, one of
whom has severe issues regarding his own self-worth.
Should the superintendent pull the student from the
class, cancel the showing, or show the film to all the
children and risk personal liability on a wrongful death
suit if the second grader successfully commits suicide in
the manner shown by the film?

These are not easy situations for school officials,[8] and
all the options for resolution have real ramifications,
but the majority approach makes the judiciary, not the
voters, the final arbiters of whether an official correctly
responded to a politically charged question. The major-
ity tries to pull this case out of the political mire and
elevate it to the level of a philosophical discussion over
whether interfering with a police officer is arguably

---

[8] My examples of situations that arguably fall outside the scope of
authority may appear fanciful, so I provide the following citations to the
very real cases on which they are based. In each case, the superintendent
or similar official was found totally immune from liability because the
personal action was found to fit generally within the scope of their
authority, notwithstanding the arguably "wrongful" nature of each act.
*Sullivan v River Valley School Bd*, unpublished opinion per curiam of the
Court of Appeals, issued July, 11, 1997 (Docket No. 181913) (tortious
interference with business relations); *Planutis v Hilling*, unpublished
opinion per curiam of the Court of Appeals, issued August, 29, 2000
(Docket No. 219972) (forcible ejection); *Graziano v Hawkins*, unpub-
lished opinion per curiam of the Court of Appeals, issued November, 15,
2005 (Docket No. 255030) (invasion of privacy); *Nalepa, supra* (suicide
movie).

wrongful in the abstract. This case is not a purely academic exercise about whether a superintendent may theoretically prevent a police officer from investigating a crime. In this, and hundreds of other real instances of police officers in schools, the question of who authorizes and controls everyday investigation, interrogation, and monitoring of students is unsettled. Schools, not police officers, are provided a tremendous measure of authority because of their responsibilities *in loco parentis*, but serious questions develop when police officers act as school officials pursuant to this expansive authority without any accountability to the school authorities from which the authority derives.[9]

---

[9] In response to my concurring colleague's insinuation that I do not believe police officers should investigate crimes in schools, I defer to the reader's judgment whether such a rhetorical and unfounded suggestion can be found in this opinion. What bothers me is not police activity in schools, but the highly potent marriage of police power with power *in loco parentis* without discernible accountability to the school in which those powers are used. Add to this troublesome concoction the judiciary's willingness to enforce the unbridled exercise of that power against a school official trying to regain control of it, and the results are disastrous. Holding a superintendent civilly liable for money damages when he acts in the place of the student's parents to protect students from unjustified acts sets an untenable precedent indeed. According to the majority's holding a student's parents would equally be liable to plaintiff if they insisted that he stop questioning their child. In fact, those issues should be easier to resolve without the legal complications of immunity.

If we are hunting down what lurks beneath the rhetoric, should I presume that Chief Judge WHITBECK's failure to acknowledge defendant's role *in loco parentis* means that we should disavow the doctrine entirely? If so, we should hold school administrators to the identical standard to which we hold patrol officers and judges, allowing discipline and dispute resolution only under the strictures of full judicial process. I note that plaintiff did not feel bound by such strictures when he threatened to press criminal charges to influence the resolution of a civil matter. The public grants administrators latitude in managing student issues that arise, and plaintiff took full advantage of that latitude. That additional power sprang from his position with the school, not his badge, and it is ultimately traceable to the highest school executive, defendant. With

These sticky issues are not made easier by selectively divorcing a superintendent's actions from his or her public office or by making blanket statements about what is "wrongful" and therefore subject to a jury's determination of personal liability. The fact that defendant took it upon himself to act or that his actions were arguably improper does not remove the actions from the scope of his authority. The plain language of the statute and the traditional approach to absolute immunity suggest that an expansive application of the phrase "scope of . . . executive authority" is appropriate. MCL 691.1407(5). Applying a narrow view of an official's scope has historically been perceived as a threat to the proper application of absolute immunity.

> "The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was

defendant's authority to adjust process to what is due and institute appropriate remedial and disciplinary measures comes the authority to limit the implementation of investigative and punitive resources. The lead and concurring opinions strip the school's administration of these tools, but do not eliminate them. Instead, they grant these powers to an assigned deputy and back his actions with the full power of the gavel, even when those actions contravene the will of the disarmed administration. This case further erodes the already diminished authority of our educators, who can ill afford to take action that would expose them to individual liability. We should not discourage our educators from doing the job the public has hired them to do.

vested in him." [*Barr v Matteo*, 360 US 564, 572; 79 S Ct 1335; 3 L Ed 2d 1434 (1959) (opinion of Harlan, J.), quoting Judge Learned Hand's opinion in *Gregoire v Biddle*, 177 F2d 579, 581 (CA 2, 1949).]

In other words, while the lead opinion diligently searches for a question of fact about defendant's true motives, the issue of scope is whether the use of power would have been justified assuming that defendant's motives were pristine. This presumption aligns with the understanding that issues regarding absolute immunity should be discerned by a judge at the outset of litigation. *Mitchell v Forsyth*, 472 US 511, 526; 105 S Ct 2806; 86 L Ed 2d 411 (1985). Without early intervention, the immunity is "effectively lost," *id.*, so taking preemptive action preserves the official from the rigors of trial and civil scrutiny, which alone threaten to " 'seriously cripple the proper and effective administration of public affairs as entrusted to the *executive branch* . . . .' " *Barr, supra* at 570 (opinion of Harlan, J.; emphasis added), quoting *Spalding v Vilas*, 161 US 483, 498; 16 S Ct 631; 40 L Ed 780 (1896).

> "The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either

alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." [*Barr, supra* at 571-572, quoting *Gregoire, supra* at 581.]

The concurring opinion ignores this presumption of good faith in nonconstitutional situations and rejects any notion that the law should preserve defendant from trial. This view runs contrary to the intention clearly and unambiguously expressed in the statute. The concurring opinion's interpretation, if adopted, would open widely the courthouse doors to those who would seek to influence public affairs through the threat and abuse of litigation.

This case sets an abominable precedent because it blurs the previously unmistakable lines marking the boundaries of a superintendent's personal liability. Now superintendents must second-guess how their administrative decisions may peripherally cause damage to subordinates and third parties. I disagree with any decision that requires superintendents to protect themselves by placing the concerns of others over the interests of the children in their charge. I would reverse.[10]

---

[10] The lead opinion fails to state with any degree of certainty what business relationship defendant has interfered with. The only interference allegations by plaintiff concern interference with the business relationship at one of defendant's schools. Because defendant is the head of the school district, it is impossible for him to be a third party who interferes with the school district's business. Neither plaintiff nor the majority takes the bold stance that the incidents involving defendant's staff, defendant's students, and the district's property were none of the district's business. Naturally, plaintiff and his interaction with students were the district's business, and the tort of interference with a business relationship does not prevent the district from tending to its own business.